NORTHWEST INDIAN CEMETERY PROTECTIVE ASSOCIATION, a nonprofit corporation; Jimmie James; Sam Jones; Lowana Brantner; Christopher H. Peters; Sierra Club, a non-profit corporation; the Wilderness Society, a nonprofit corporation; California Trout, a non-profit corporation; Siskiyou Mountains Resource Council, an unincorporated association; Redwood Region Audubon Society, an unincorporated association; Northcoast Environmental Center, a non-profit corporation; Timothy McKay; and John Amodio; Plaintiffs,

v.

R. Max PETERSON, in his official capacity as Chief, United States Forest Service; John R. Block, in his official capacity as Secretary of the Department of Agriculture; United States Forest Service; and United States of America; Defendants.

STATE OF CALIFORNIA, Acting By and Through The NATIVE AMERICAN HERITAGE COMMISSION, Plaintiff,

v.

John R. BLOCK, in his official capacity as Secretary of the United States Department of Agriculture; R. Max Peterson, in his official capacity as Chief of the Forest Service of the United States Department of Agriculture; Zane G. Smith, Jr., in his official capacity as Regional Forester of the California Region of the Forest Service of the United States Department of Agriculture, Defendants.

Nos. C–82–4049 SAW, C–82–5943 SAW.

United States District Court,
N.D. California.

May 24, 1983.

Joseph P. Russoniello, U.S. Atty., Rodney H. Hamblin, Asst. U.S. Atty., San Francisco, Cal., for defendants.

Michael R. Sherwood, Julie E. McDonald, Sierra Club Legal Defense Fund, San Francisco, Cal., Marilyn B. Miles, Michael S. Pfeffer, David J. Rapport, California Indian Legal Services, Eureka, Cal., John K. Van De Kamp, Atty. Gen., of the State of Cal., Robert H. Connett, Asst. Atty. Gen., Edna Walz, Deputy Atty. Gen., Sacramento, Cal., for plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WEIGEL, District Judge.

These two suits, consolidated for trial, challenge decisions by the United States Forest Service (Forest Service) (1) to complete construction of the last 6.02 miles

(Chimney Rock Section) of a paved road from Gasquet, California, to Orleans, California (the "G–O road"), and (2) to adopt a forest management plan providing for the harvesting of timber for the Blue Creek Unit of Six Rivers National Forest.

Plaintiffs in *Northwest Indian Cemetery Protective Association, et al.,* C–82–4049 SAW, are seven non-profit corporations and unincorporated associations (Northwest Indian Cemetery Protective Association, Sierra Club, The Wilderness Society, California Trout, Siskiyou Mountains Resource Council, Redwood Region Audubon Society, and Northcoast Environmental Center), four individual plaintiffs of American Indian heritage (Jimmie James, Sam Jones, Lowana Branter, and Christopher H. Peters), and two Sierra Club members (Timothy McKay and John Amadio). Defendants are R. Max Peterson, Chief, Forest Service, and John R. Block, Secretary of the United States Department of Agriculture. The State of California, acting through its Native American Heritage Commission, is the sole plaintiff in *California v. Block, et al.,* C–82–5943 SAW. Defendants are Secretary of Agriculture Block, Forest Service Chief Peterson, and Zane G. Smith, Jr., Regional Forester of the California Region of the Forest Service.

The 67,500 acre Blue Creek Unit is located in Del Norte and Humboldt counties in the northwestern corner of California. Approximately 31,100 acres of the Unit is virgin Douglas Fir forest, and has been inventoried by the Forest Service as a roadless area.[1] On its northern boundary, the Unit adjoins the Eight-mile and Siskiyou inventoried roadless areas. Blue Creek itself, located within the Unit, is a tributary to the Klamath River and contains important spawning habitat for several anadromous fish species.[2]

On November 12, 1974, the Forest Service first proposed in a Draft Environmental Statement (DES) various land use management plans for the Blue Creek Unit. *See* Def.Ex. A. The Forest Service then issued a Supplemental DES (SDES) in 1975, *see* Def.Ex. B, and a Final Environmental Statement (FES) on May 21, 1975. *See* Def.Ex. C. On February 19, 1981, Regional Forester Smith selected Alternative E from among the alternative land use plans proposed in the FES. The Forest Service subsequently modified Alternative E and issued its recommended management plan in a document entitled "Blue Creek Unit Implementation Plan" (the Management Plan). *See* Def.Ex. J. The Management Plan calls for the harvesting over the next 80 years of 733 million board feet of timber from the Blue Creek Unit. *Id.* at 4.

On November 7, 1977, the Forest Service proposed various alternative routes for the Chimney Rock Section of the G–O road designed to link the existing Summit Valley and Dillon-Flint Sections of the road. These various routes are all located within the Blue Creek Unit. *See* Def.Ex. E. On March 2, 1982, Regional Forester Smith selected Alternative D–4 as the proposed route for the Chimney Rock Section. *See* Def.Ex. G.

Following exhaustion of their administrative appeals of both Forest Service decisions, plaintiffs filed these suits alleging that the challenged decisions violate: (1) the First Amendment of the Constitution of the United States; (2) the American Indian Freedom of Religion Act of 1978 (AIFRA), 42 U.S.C. § 1996; (3) the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.,* and the Wilderness Act, 16 U.S.C. § 1131 *et seq.;* (4) the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.;* (5) water and fishing rights reserved to American Indians on the Hoopa Valley Indian Reservation, and defendants'

---

**1.** *See State of California v. Bergland,* 483 F.Supp. 465, 471–73 (E.D.Cal.1980) (describing roadless area program), *modified,* 690 F.2d 753 (9th Cir.1982).

**2.** Anadromous fish spend their adult lives in the ocean but return to fresh water rivers and streams to spawn. Anadromous species present in Blue Creek include Chinook Salmon, Coho Salmon, King Salmon, and Steelhead Trout. Tr. at 940–41. Spawning gravels in Blue Creek account for approximately 5% of the anadromous fish production of the Klamath River system.

trust responsibility towards those rights; (6) the Administrative Procedure Act, 5 U.S.C. § 706; (7) the Multiple Use Sustained-Yield Act, 16 U.S.C. §§ 528–31; and (8) the National Forest Management Act of 1976, 16 U.S.C. § 1600 *et seq.* Plaintiffs moved for a preliminary injunction to prevent the Forest Service from soliciting competitive bids on the Chimney Rock Section of the G–O road. On December 17, 1982, the Court denied preliminary injunctive relief and, based upon defendants' assurance that no construction would occur prior to the Court's ruling on the merits, instead chose to conduct an early trial. *See Northwest Indian Cemetery Protective Ass'n v. Peterson,* 552 F.Supp. 951 (N.D.Cal.1982).

Based upon the evidence presented at trial, the Court finds that the challenged Forest Service decisions violate (1) the First Amendment of the Constitution of the United States; (2) NEPA and the Wilderness Act; (3) the Federal Water Pollution Control Act; (4) Indian water and fishing rights on the Hoopa Valley Indian Reservation, and defendants' trust responsibility towards those rights; and (5) the Administrative Procedure Act. This memorandum constitutes the Court's findings of fact and conclusions of law.

## I. *The First Amendment*

■ In reviewing the nature of the religious beliefs involved in this case, it must be remembered that their unorthodox character is no basis for denial of the protection of rights guaranteed by the Free Exercise Clause. *See, e.g., Thomas v. Review Bd.,* 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981). Thus, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Id.*

The northeastern corner of the Blue Creek Unit is considered sacred land by members of the Yurok, Karok, and Tolowa Indian tribes.[3] This region is known as the "high country." Although the high country includes the highest mountain peaks in this corner of the Blue Creek Unit, such as Chimney Rock, Doctor Rock, and Peak 8, the area considered sacred encompasses an entire region rather than simply a group of individual sites (Def.Ex. G–K, Theodoratus Report (hereinafter "Theo.Rpt."), at 419). The Indian plaintiffs and the State of California assert that either construction of Alternative D–4 (hereinafter the Chimney Rock Section) or implementation of the Management Plan would desecrate the high country in violation of the Indian plaintiffs' rights under the Free Exercise Clause of the First Amendment.

The Indian plaintiffs' use of the high country for religious purposes is not in dispute. Ceremonial use of the high country by the Yurok, Karok, and Tolowa tribes dates back to the early nineteenth century (Trial Transcript (hereinafter "Tr.") at 267–68) and probably much earlier (Theo.Rpt. at 230–73, 386). Members of these tribes currently make regular use of the high country for several religious purposes. Individuals hike into the high country and use "prayer seats" located at Doctor Rock, Chimney Rock, and Peak 8 to seek religious guidance or personal "power" through "engaging in emotional [and] spiritual exchange with the creator" (Tr. at 79). Such exchange is made possible by the solitude, quietness, and pristine environment found in the high country. Certain key participants in tribal religious ceremonies such as the White Deerskin and Jump Dances[4] must visit the high country prior to the ceremony to purify themselves and to make "preparatory medicine" (Theo.Rpt. at 46). The religious

---

**3.** Secrecy surrounding religious use of the high country makes estimation of the number of users difficult. *See* Tr. at 247. Nevertheless, it appears that between 110 and 140 members of these tribes make current use of the high country for religious purposes, although the nature and frequency of such use varies widely among these individuals. *See* Tr. at 84–89. This number does not include the much larger group of tribal members who participate in religious ceremonies involving use of the high country. *See* Tr. at 109–13.

**4.** Tr. at 227. These dances provide the periodic "World Renewal" that is essential to the Indians' religious belief system. *See* Theo.Rpt. at 45–49.

power these individuals acquire in the high country lends meaning to these tribal ceremonies, thereby enhancing the spiritual welfare of the entire tribal community (Tr. at 110–13; Theo.Rpt. at 417). Medicine women in the tribes travel to the high country to pray, to obtain spiritual power, and to gather medicines (Tr. at 237–39). They then return to the tribe to administer to the sick the healing power gained in the high country through ceremonies such as the Brush and Kick Dances (*Id.;* Theo.Rpt. at 52–58).

For a number of reasons, the Indian plaintiffs contend that construction of the Chimney Rock Section would violate the sacred qualities of the high country and impair its successful use for religious purposes. First, they claim, visibility of the road from religious sites would damage the pristine visual conditions found in the high country that are essential for its religious use (Tr. at 239; Theo.Rpt. at 419–20). (The Chimney Rock Section would dissect the high country, and separate Chimney Rock to the north from Peak 8 and Doctor Rock to the south.) Second, increased aural disturbances from construction and use of the road would similarly impair the success of religious and medicinal quests into the high country.[5] Third, environmental degradation of the high country resulting from construction of the road would erode the religious significance of the areas (Theo. Rpt. at 420). Finally, religious use of the area would be impaired by increased recreational use resulting from construction of the Chimney Rock Section (Theo.Rpt. at 418–19).

The Management Plan calls for the harvesting of timber and the construction of approximately 200 miles of logging roads in areas immediately adjacent to Chimney

Rock, Doctor Rock, Peak 8, and to other religious sites within the high country. The Forest Service has proposed "protective zones" around Chimney Rock, Doctor Rock, Peak 8, and a few other sites, which would forbid timber harvesting or the construction of logging roads within one-half mile of these locations. See Def.Ex. C, at 224–25; Def.Ex. J. Even so, plaintiffs urge that these protective zones would fail significantly to mitigate the adverse visual, aural, and environmental impacts of logging activities on the high country's salient religious characteristics.[6]

### A. The Free Exercise Clause

 The First Amendment forbids infringement of the free exercise of religion. Government action violates the Free Exercise Clause if it imposes a burden on the free exercise of religion unless the government establishes "a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause." *Wisconsin v. Yoder,* 406 U.S. 205, 214, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1971); *see Sherbert v. Verner,* 374 U.S. 398, 403–09, 83 S.Ct. 1790, 1793–96, 10 L.Ed.2d 965 (1962). Furthermore, "only those interests of the highest order * * * can overbalance legitimate claims to the free exercise of religion." *Yoder, supra,* 406 U.S. at 215, 92 S.Ct. at 1533. Even if the government advances such an interest, it must demonstrate that no other means of serving that interest exists which is less restrictive of plaintiffs' First Amendment rights. *See, e.g., Sherbert, supra,* 374 U.S. at 407–08, 83 S.Ct. at 1795–96; *Murdock v. Pennsylvania,* 319 U.S. 105, 116, 63 S.Ct. 870, 876, 87 L.Ed. 1292 (1942); *Cantwell v. Connecticut,* 310 U.S. 296, 307–08, 60 S.Ct. 900, 904–05, 84 L.Ed. 1213 (1939).

---

**5.** The Forest Service estimates that an average of 76 logging and 92 other vehicles would traverse the Chimney Rock Section every day. Def.Ex. G, at 34.

**6.** The religious integrity of the high country rests on the pristine qualities of the entire area rather than on just a few individual sites. Theo.Rpt. at 419. Because many of the most important sites are located at the highest eleva-

tions, the visual impact of logging the valleys between these peaks could not be mitigated. See Tr. at 239. In addition, under the Management Plan the "Golden Stairs Trail," which Indians on religious quests frequently use to reach the high country, would be "screened off" from logged areas on each side by strips of unlogged land only one-eighth mile in width. Def.Ex. C, at 224.

Relatively few courts have faced claims similar to those advanced by the Indian plaintiffs in this case. A majority of those courts concluded that the challenged government activity did not burden the free exercise of Indian religious practices. In *Sequoyah v. Tennessee Valley Authority,* 620 F.2d 1159 (6th Cir.) *cert. denied,* 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 216 (1980), members of the Cherokee Indian tribe brought suit to enjoin completion of the Tellico Dam on the Little Tennessee River on the ground that if completed the dam would flood their "sacred homeland" and destroy various sites of cultural and medicinal importance to their tribe. The court of appeals upheld the district court's grant of summary judgment for defendant based on plaintiffs' failure to demonstrate the centrality of the land to be flooded to the practice of their religion. *Id.* at 1164. Thus, the court of appeals concluded that plaintiffs had shown that the challenged action would burden their "cultural history and tradition" rather than any interest protected by the Free Exercise Clause. *Id.* at 1165.

In *Crow v. Gullet,* 541 F.Supp. 785 (D.S. D.1982), members of the Lakota and Tsistsistas Indian tribes alleged that South Dakota's construction of roads and parking lots had disturbed the natural features of Bear Butte, a site of religious significance to the Indians located in the Black Hills. In addition, plaintiffs asserted that the state had failed to control tourist behavior that interfered with plaintiffs' religious practices on the Butte, and that the state's regulation of Indian campers visiting the Butte similarly interfered with the religious practices of those campers. The district court granted defendants' motion for summary judgment on the ground that defendants' construction did not burden plaintiffs' religious practices but instead facilitated them by improving Indian access to, and diverting tourists from, Bear Butte. The court also found that the "distractions" caused by occasional tourist "misbehavior" on the Butte did not interfere with plain-

tiffs' religious practices, and that various permit requirements and other regulations imposed on Indian campers at the Butte did not impede their ability to engage in religious practices. *Id.* at 791–93.

In *Hopi Indian Tribe v. Block,* 8 ILR 3073 (D.D.C. June 15, 1981), plaintiffs sought to prevent further development of recreational facilities known as the Arizona Snow Bowl located in the San Francisco Peaks region of Coconimo National Forest. They claimed that such development would disturb Indian deities inhabiting the Peaks. The court concluded that the proposed development "[would] not impinge upon the continuation of all essential ritual practices," *id.* at 3075, and granted defendants summary judgment.

One court has directly addressed the issue of what state interests may justify a government-imposed burden on Native America religious practices. In *Badoni v. Higginson,* 638 F.2d 172 (10th Cir.1980), *cert. denied,* 452 U.S. 954, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981), certain Navajo Indians challenged the federal government's operation of Glen Canyon Dam and management of the Rainbow Bridge National Monument on the grounds that flooding resulting from the dam project had denied them access to a prayer spot sacred to the Navajos, and that the presence and behavior of tourists at Rainbow Bridge prevented the Navajos from conducting traditional religious ceremonies at sites near the Bridge. The court of appeals upheld the district court's grant of summary judgment for defendants, finding that maintenance of existing water levels in Glen Canyon Reservoir was "a crucial part of a multi-state water storage and power generation project," and that no less restrictive means of serving that interest existed.[7] *Id.* at 177. In addition, the court of appeals found that plaintiffs were not entitled to have tourists excluded from Rainbow Bridge National Monument, given the Park Service's "strong interest in assur-

---

7. The court of appeals did not reach the issue whether the flooding constituted a burden on plaintiffs' free exercise of religion. *Badoni, supra,* 638 F.2d at 177, n. 4.

ing public access to th[at] natural wonder," and statutory duty to do so. *Id.* at 178.

■ In the present case, defendants concede that the Indian plaintiffs' use of the high country for religious practices is entitled to First Amendment protection. The Indian plaintiffs' claim that the high country is sacred is both sincerely held and "rooted in religious belief." *Yoder, supra,* 406 U.S. at 215–16, 92 S.Ct. at 1533. The unorthodox character of those religious beliefs does not deprive them of the safeguards contained in the Free Exercise Clause. *See, e.g., Thomas, supra,* 450 U.S. at 714, 101 S.Ct. at 1430. Similarly, plaintiffs' lack of a property interest in the high country does not release defendants from the constitutional responsibilities the First Amendment imposes on them.[8] *See Badoni, supra,* 638 F.2d at 176; *Sequoyah, supra,* 620 F.2d at 1164.

### 1. *A Burden on the Free Exercise of Religion*

■ The first step in evaluating plaintiffs' claim based upon their constitutional right to the free exercise of religion is to determine whether the challenged actions do burden that right. The evidence establishes that construction of the Chimney Rock Section and/or implementation of the Management Plan would seriously impair the Indian plaintiffs' use of the high country for religious practices.

For generations, individual members, spiritual leaders, and medicine persons of the Yurok, Karok, and Tolowa tribes have traveled to the high country to communicate with the "great creator," to perform rituals, and to prepare for specific religious and medicinal ceremonies. Such use of the high country is "central and indispensable" to the Indian plaintiffs' religion. *See, e.g., Sequoyah, supra,* 620 F.2d at 1164; *Hopi, supra,* 8 ILR at 3075. For the Yurok, Karok, and Tolowa peoples, the high country constitutes the center of the spiritual world. No other geographic areas or sites hold equivalent religious significance for these tribes. Further, use of the high country is essential to performing the "World Renewal" ceremonies, such as the White Deerskin and Jump Dances, which constitute the heart of the Northwest Indian religious belief system (Theo.Rpt. at 45–49). Finally, use of the high country in training young persons in the tribes in traditional religious beliefs and ceremonies is necessary to preserve such practices and to convey them to future generations (Tr. at 77). Degradation of the high country and impairment of such training would carry "a very real threat of undermining the [tribal] communit[ies] and religious practice[s] as they exist today." *Yoder, supra,* 406 U.S. at 218, 92 S.Ct. at 1534.

Communication with the "great creator" is possible in the high country because of the pristine environment and opportunity for solitude found there (Theo.Rpt. at 419–20). Construction of the Chimney Rock Section and/or the harvesting of timber in the high country, including "clear-cutting,"[9] would seriously damage the salient

---

**8.** Of course, no First Amendment right exists to assemble in a busy traffic intersection for religious purposes or on a public sidewalk thronging with pedestrians. In such cases, a strong public interest in maintaining public safety and order outweighs any religious interests involved. *See, e.g., Food Employees v. Logan Plaza,* 391 U.S. 308, 320–21, 88 S.Ct. 1601, 1609, 20 L.Ed.2d 603 (1968); *Cox v. Louisiana,* 379 U.S. 536, 554–55, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965); *Niemotko v. Maryland,* 340 U.S. 268, 288–89, 71 S.Ct. 325, 336, 95 L.Ed. 267 (1951) (Frankfurter, J., concurring). Nevertheless, the government must attempt to accommodate the legitimate religious interests of the public when doing so threatens no public interest, even when those religious interests involve use of public property. *See Sherbert v. Verner,* 374 U.S. 398, 404–05, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963); *Niemotko, supra,* 340 U.S. at 289, 71 S.Ct. at 336 (Frankfurter, J., concurring). This is especially true when government action threatens religious conduct *per se* rather than merely inconveniencing that conduct through imposition of restrictions reasonable as to time, place, or manner.

**9.** Under clear-cutting or "even age management" techniques, all timber in the area is removed in one cut and the area is replanted. *See* Tr. at 481; *Texas Comm. on Nat'l Resources v. Bergland,* 573 F.2d 201, 205 (5th Cir.), *cert. denied,* 439 U.S. 966, 99 S.Ct. 455, 58 L.Ed.2d 425 (1978).

visual, aural, and environmental qualities of the high country. The Forest Service's own study concluded that "[i]ntrusions on the sanctity of the Blue Creek high country are * * * potentially destructive of the very core of Northwest [Indian] religious beliefs and practices" (Theo.Rpt. at 420).

Upon careful analysis, it will be seen that prior cases involving Indian religious claims support the conclusion that the government actions proposed here burden the free exercise of plaintiffs' religion. Unlike the present case, plaintiffs in *Sequoyah* did not claim that the area threatened with flooding played a central role in the practice of their religion, and in fact failed to demonstrate that there had been significant past use of the area for religious purposes. 620 F.2d at 1163–64. Likewise, plaintiffs in *Hopi* failed to show that the 777 acre parcel planned for development within the 75,000 acre San Francisco Peaks region was "central or indispensable to their religion. 8 ILR at 3075. In *Crow v. Gullet,* there was no claim that the challenged actions did more than possibly inconvenience Indian worshippers at Bear Butte by, for example, requiring campers to register with park officials. 541 F.Supp. at 791–93.

Other cases directly support the conclusion that the proposed Forest Service actions impose an unlawful burden on the free exercise of plaintiffs' religion. In *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1962), the Supreme Court held that a state law disqualifying a member of the Seventh-Day Adventist Church from eligibility for unemployment compensation based upon her unavailability for Saturday work due to observance of the Sabbath imposed an unlawful burden on the free exercise of her religion. The Court found such a burden to exist even though it constituted "the denial of * * * a benefit or privilege," and was "only an indirect result of welfare legislation within the State's general competence to enact * * * * *" *Id.* at 403–04 & n. 5, 83 S.Ct. at 1793–94 & n. 5; *see also Wisconsin v. Yoder,* 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1971); *Pillar of Fire v. Denver Urban Renewal Auth.,* 181 Colo. 411, 509 P.2d 1250,

1254 (Colo.1973). In a case also involving Indian religious practices, *People v. Woody,* 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964), the California Supreme Court overturned the convictions of a group of Navajo Indians for unlawful use of peyote on the ground that use of the drug constituted an integral element of their religious practices.

### 2. *Overriding State Interest*

■ Once a burden on the free exercise of religion is established, "only those interests of the highest order" can uphold the challenged government action. *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972). Defendants assert that construction of the Chimney Rock Section of the G–O road would (1) increase the quantity of timber accessible to harvesting in the Blue Creek Unit; (2) stimulate employment in the regional timber industry; (3) provide recreational access to the Blue Creek Unit as well as permit through recreational traffic on the G–O road; (4) further the efficient administration of Six Rivers National Forest by the Forest Service; and (5) increase the price of bids on future timber sales in the Orleans area of Six Rivers National Forest by decreasing the cost of hauling such timber to timber mills located in Del Norte County (Tr. at 1258–59). Defendants also contend that implementation of the Management Plan would increase timber production in the Blue Creek Unit, thereby stimulating the regional timber industry and increasing Forest Service revenues, a fixed proportion of which is returned to the four counties partly located in Six Rivers National Forest.

Construction of the Chimney Rock Section would not materially serve several of the claimed governmental interests. First, the Forest Service concedes that construction of the Chimney Rock Section would not improve access to timber resources in the Blue Creek Unit. That timber could be harvested without building the Chimney Rock Section (Tr. at 1298; Def.Ex. G, App. B, at 1). Second, completion of the Chimney Rock Section would result in no net

increase in the number of jobs in the regional timber industry. The most it would accomplish would be the transfer of a certain number of jobs from Humboldt County to Del Norte County (Tr. at 1305). Third, increased recreational access to the area as a result of construction of the Chimney Rock Section cannot support infringement of plaintiffs' First Amendment rights. Recreational access to the area currently exists, and the Forest Service projects that an average of only eight vehicles per day would use the road for recreational purposes (Def.Ex. G, at 34). Moreover, although recreational access to the area by means of motor vehicles would be somewhat improved, resulting environmental degradation would decrease the area's suitability for primitive recreational use.

The remaining interests defendants offer in support of construction of the Chimney Rock Section fall far short of constituting the "paramount interests" necessary to justify infringement of plaintiffs' freedom of religion. Sherbert, supra, 374 U.S. at 406, 83 S.Ct. at 1795. Construction of the road would not greatly improve the efficient administration of Six Rivers National Forest. The Forest Service is currently able efficiently to provide all needed administrative services to the Chimney Rock-Doctor Rock area (Tr. at 1333). In fact, several such services, such as insect control, habitat improvement, and monitoring of visitors, are provided on a districtwide rather than forestwide basis. Thus, provision of these services in the Blue Creek Unit would be shared by the district rangers stationed in Orleans and Gasquet regardless of whether the Chimney Rock Section is constructed. Hence, construction of the road would not make the provision of these services significantly more efficient (Tr. at 1324–26). The Forest Service's interest in more efficiently providing road maintenance and fire protection cannot justify infringement of the free exercise of plaintiffs' religion. Both services are efficiently provided at present.

Defendants' claim that construction of the Chimney Rock Section would increase competition for timber in the Orleans area of Six Rivers National Forest, and thus increase Forest Service revenues. This claim is too speculative to support infringement of plaintiffs' First Amendment rights. Although construction of the Chimney Rock Section would reduce timber haul costs from the Orleans region to Del Norte County mills, no increase in bid prices on timber sales in the Orleans area would result unless Del Norte County mills can effectively compete for sales in the Orleans region. A large number of mills in Humboldt County currently compete for these sales. See Pl.Ex. 45(a). Defendants failed to introduce any evidence whatever establishing the likely effect of the road construction on regional timber markets. See Tr. at 1159–62, 1166–67, 1258; Def.Ex. E, at 107–08, App. D & E. Such speculative and diffuse goals as these cannot provide the basis for denying plaintiffs' free exercise claim. See Sherbert, supra, 374 U.S. at 407, 83 S.Ct. at 1795.

Past investment of resources in existing paved sections of the G–O road does not justify construction of the Chimney Rock Section. Those sections of the G–O road provide improved and useful access to vast recreational, timber, and other resources in the region (Tr. at 1298, 1332–33).

Harvesting of timber from the Blue Creek Unit pursuant to the Management Plan would not serve any compelling public interest. That timber is a small fraction of the timber resources found in the entire Six Rivers National Forest. Its harvesting would not significantly affect timber supplies. Moreover, the regional timber industry will not suffer greatly without access to timber in the Unit. Finally, even if defendants could demonstrate a compelling need for additional timber harvesting in the Blue Creek Unit, means less restrictive of plaintiffs' First Amendment rights than the Management Plan exist that would satisfy that need. The Management Plan could easily be more narrowly tailored to accommodate Indian religious use of the high country and at the same time exploit most of the timber resources present in the Blue Creek Unit. See Def.Ex. C, at 118–25 (discussing Alternatives A & B); Tr. at 1312–

15 (possibility of increasing size of Indian religious protective zones).

### B. *The Establishment Clause*

 Defendants assert that the grant of an injunction preventing construction of the Chimney Rock Section or implementation of the Management Plan based upon the Indian plaintiffs' free exercise claim would create a government-managed "religious shrine" in violation of the Establishment Clause of the First Amendment. This assertion is without merit. Actions compelled by the Free Exercise Clause do not violate the Establishment Clause. In the present case, the Forest Service failed to accommodate the Indian plaintiffs' religious practices to the extent required by the Free Exercise Clause. Government actions having the goal and effect of such accommodation and which do not result in excessive government entanglement with religion are consistent with the Establishment Clause.[10] *See, e.g., Hunt v. McNair,* 413 U.S. 734, 741–49, 93 S.Ct. 2868, 2873–77, 37 L.Ed.2d 923 (1973); *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). Otherwise, courts could not, based upon the need to accommodate legitimate religious practices, grant exemptions to laws requiring compulsory school attendance, *see Yoder, supra,* punishing use of peyote, *see People v. Woody, supra,* or fixing eligibility standards for unemployment compensation, *see Sherbert, supra.*

The nature of the relief the Indian plaintiffs seek supports the conclusion that accommodation of the Indian plaintiffs' free exercise rights does not entail excessive governmental entanglement with religion. Plaintiffs do not request that the Forest Service exclude recreational users from the Blue Creek Unit or regulate the behavior of those users in any way. *Cf. Badoni, supra,* 638 F.2d at 179; *Hopi, supra,* 8 ILR at 3075–76. Rather, plaintiffs contend that in reaching its decisions the Forest Service failed to weigh competing public interests,

both secular and religious, in the manner prescribed by the First Amendment. Since plaintiffs prevail on that claim, the offending decisions of the Forest Service cannot stand.

### II. *American Indian Religious Freedom Act of 1978*

The Indian Plaintiffs also assert that construction of the Chimney Rock Section and implementation of the Management Plan would violate the American Indian Religious Freedom Act of 1978 (AIRFA), 42 U.S.C. § 1996. That Act states "it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the[ir] traditional religions * * *, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites."

 The AIRFA "does not [expressly] create a cause of action in federal courts for violation of rights in religious freedom." *Crow v. Gullet,* 541 F.Supp. 785, 793 (D.S.D. 1982). Rather, at most it requires "that agencies evaluate their policies and procedures with the aim of protecting Indian religious freedoms." *Hopi Indian Tribe v. Block,* 8 ILR 3073, 3076 (D.D.C. June 15, 1981). The legislative history of the Act supports this interpretation. *Id.;* Pl.Ex. G, App. A.

 Although defendants' proposed actions violate the Indian plaintiffs' First Amendment rights, defendants did make sufficient efforts to protect those rights to satisfy the requirements of the AIRFA. Defendants commissioned studies on Indian religious beliefs and practices, *see* Def.Ex. G–K & F, and held hearings at which Indian representatives testified. In addition, defendants selected the D–4 route for the Chimney Rock Section in part in order to lessen the road's adverse impacts on Chim-

---

**10.** Defendants do not argue that preservation of the high country as wilderness would lead to such entanglement. In fact, less entanglement would result if the high country were so preserved than if the Chimney Rock Section were constructed and the Forest Service attempted to regulate access to the high country. *See Crow v. Gullet,* 541 F.Supp. 785 (D.S.D.1982).

ney Rock (Def.Ex. G, at 53). Under these circumstances, defendants' decisions to construct the Chimney Rock Section and to implement the Management Plan comply with the mandate of the AIRFA.

### III. *National Environmental Policy Act*

In response to "the growing environmental problems and crises the Nation faces," S.Rep. 91–296, 91st Cong., 1st Sess. 4 (1969), Congress passed the National Environmental Policy Act (NEPA) and declared "a national policy [to] encourage productive and enjoyable harmony between man and his environment; [and] to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man * * *" 42 U.S.C. § 4321. To assure that federal agencies comply with this mandate, Congress required them to prepare a detailed statement on the environmental impact of the proposed action in connection with any federal actions "significantly affecting the quality of the human environment." The statement must cover any unavoidable adverse effects of the proposed action, alternatives to the proposed action, the relationship between short-term uses of the environment and long-term productivity, and any irreversible commitments of resources required by the proposed action. 42 U.S.C. § 4332(2)(C).

The role of the courts in reviewing the adequacy of an environmental impact statement (EIS) is limited. In this circuit, an EIS must be upheld if it "reasonably set[s] forth sufficient information to enable the decisionmaker to consider the environmental factors and make a reasoned decision." *Adler v. Lewis,* 675 F.2d 1085, 1096 (9th Cir.1982) (citations omitted); *see Save Lake Washington v. Frank,* 641 F.2d 1330, 1334 (9th Cir.1981).

### A. *The Chimney Rock Section of the G–O Road*

Plaintiffs contend that the Final Environmental Impact Statement (FEIS) (Def.Ex. G) and Draft Environmental Statement (DES) (Def.Ex. E) prepared for the Chimney Rock Section of the G–O road are inadequate in that: (1) they fail to discuss adequately the impacts of the road on geologic and soil stability; (2) they fail to discuss adequately the impacts of the road on Indian cultural resources; (3) they contain an inadequate discussion of alternatives; (4) no supplemental EIS was prepared despite defendants' receipt of new information concerning the impact of the road on Indian cultural resources; and (5) they fail adequately to disclose the impact of the road (as well as the cumulative impact of the road and implementation of the Management Plan) on water quality and sedimentation in Blue Creek, and to describe proposed measures needed to mitigate adverse impacts on water quality.

These contentions are now examined *seriatim.*

### 1. *Geologic and Soil Stability*

The FEIS fairly discloses the existence of slope stability problems along the proposed route for the Chimney Rock Section. The FEIS identifies the existence of dormant and active landslides along the proposed route (Def.Ex. G, at 45–46). In addition, the FEIS acknowledges that "cutbank and fillslope failures" of up to 1,000 cubic yards of soil and rock may occur as a result of the road construction (Def.Ex. G–A, at 16). Thus, the FEIS admits the existence of these slope stability problems but states that they are comparable to those found along other sections of the G–O road (Def.Ex. G, at 43). Plaintiffs have not demonstrated that landslide activity along the proposed Chimney Rock Section would be significantly greater than that found along existing sections of the G–O road. Hence, the FEIS and DES fairly disclose the geologic and soil stability problems that construction of the Chimney Rock Section would pose.

### 2. *Indian Cultural Resources*

Although the FEIS asserts that the proposed Chimney Rock Section would have less visual and audible impacts on Chimney Rock than would alternative routes, it unequivocally states that "all of the proposed

routes will create an adverse impact [on Indian cultural resources]," and that "[s]ome impacts appear to be nonmitigatable" (Def.Ex. G, at 52–53). Further, the Theodoratus Report, adopted by the Forest Service, acknowledges that "[t]he nature of Northwest Indian perceptions of the high country and the requirements of their specific religious beliefs and practices associated with the high country make mitigation of the impact of construction of any of the proposed routes [for the Chimney Rock Section] impossible" (Theo.Rpt. at 420). Although the Forest Service gave inadequate weight to the religious interests at stake, the FEIS acknowledges the harsh impact that construction of the Chimney Rock Section would have on Indian religious use of the high country. NEPA requires no more. *See Save Lake Washington v. Frank,* 641 F.2d 1330, 1334 (9th Cir.1981).

### 3. *Discussion of Alternatives*

■ An EIS must set forth those alternatives necessary to permit a reasoned choice by the decisionmaker. *See Brooks v. Coleman,* 518 F.2d 17, 19 (9th Cir.1975). Plaintiffs assert that the Chimney Rock Section FEIS and DES "dismiss out of hand" the alternatives of not constructing the road (Alternative A) or of routing the road to avoid entirely the corridor between Chimney Rock and Doctor Rock (Alternatives E & E–F).

The FEIS does not support plaintiffs' claim. The FEIS evaluates Alternatives A, E, and E–F in a manner that parallels its analysis of other alternatives. *See* Def.Ex. G, at 39, 64–65. Alternatives E and E–F are evaluated based upon several factors, including length, construction and maintenance costs, steepest gradient, size of area disturbed, timber haul costs, and driveability. *See id.* at 39 (Table 10). The FEIS ultimately rejects these alternatives based upon their excessive length, construction cost, and haul cost, *see id.* at 41, conclusions that plaintiffs did not effectively challenge at trial. Hence, the FEIS contains an adequate discussion of alternatives. *See Columbia Basin Land Protection Ass'n v. Schlesinger,* 643 F.2d 585, 593 (9th Cir.

1981); *Ventling v. Bergland,* 479 F.Supp. 174, 180–81 (D.S.D.), *aff'd,* 615 F.2d 1365 (8th Cir.1979).

### 4. *Supplemental Environmental Impact Statement*

Plaintiffs contend that after issuing the Chimney Rock Section FEIS on March 2, 1982, defendants received new information concerning Indian cultural resources in the Blue Creek Unit that required them to prepare a supplemental EIS. Such a supplement must be prepared if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (1982).

Plaintiffs offered no evidence in support of this contention at trial. In fact, the evidence contradicts it. The Theodoratus Report, commissioned by the Forest Service, was completed and made available to the Forest Service on April 9, 1979, almost three years before the Chimney Rock Section FEIS was completed. Similarly, Dr. Winter's review of the Theodoratus Report (Def.Ex. F) was completed in May, 1979. The FEIS incorporates the findings of these studies, which are the most comprehensive available of Indian religious beliefs and practices. Consequently, no supplemental EIS was required.

### 5. *Water Quality*

Plaintiffs contend that the Chimney Rock Section FEIS and DES are inadequate in that they: (1) fail sufficiently to disclose the impact of the road construction on water quality; (2) fail to discuss the cumulative impact of the road construction and implementation of the Management Plan on water quality; and (3) fail adequately to describe what measures would be taken to mitigate adverse impacts on water quality. The FEIS and DES are deficient in all three respects.

■ First, the FEIS and DES fail to disclose the major increase in sediment in Blue Creek likely to result from construction of the Chimney Rock Section. The FEIS asserts:

The use of [Best Management Practices] should minimize any increased sedimentation in Blue Creek [resulting from construction of the road]. If a small amount of sedimentation does occur, the increased sediment could result in a small decrease in water quality. The increased sediment would add to the bed loads of the creeks within the sub-basin * * * * There are no indications that any beneficial use will be measurably affected, directly or indirectly in the short or long-term future.

Def.Ex. G, at 47. By contrast, the evidence establishes that construction of the Chimney Rock Section would result in as much as a 500% increase in sediment loads in Blue Creek (Tr. at 444). The vast majority of the Blue Creek Unit consists of steep, unstable terrain. Elevations in the Unit range from 1,200 to 6,000 feet above sea level. Because of heavy annual rainfall in the Unit, over 90% of the terrain has a "high erosion hazard rating." Furthermore, the D–4 route travels the closest to Blue Creek of any of the alternatives considered in the FEIS that traverse the Chimney Rock-Doctor Rock corridor. Consequently, it poses the greatest hazard to increased sedimentation in Blue Creek. A single minor landslide along the proposed route would dramatically raise sediment levels in Blue Creek (Tr. at 446–47), thereby violating state water quality standards and endangering fish spawning habitat downstream (Tr. at 948).

In addition, the FEIS' conclusion that no significant increase in sedimentation in Blue Creek would occur is based on geologic assumptions contradicted by the DES and by the FEIS itself. In predicting the level of sedimentation likely to result from construction of the Chimney Rock Section, the DES assumes that no debris slides, rock-slides, or small landslides will occur because "there [is] no justifiable way to predict such [slope] failures" (Def.Ex. E, at 147). Yet both the DES and FEIS themselves predict that various types of slope failures includ-

ing debris slides are likely to occur as a result of construction and that such failures would involve up to 400 cubic yards of debris per mile of road per year.[11] Def.Ex. G, at 43; see Def.Ex. G–A, at 16 (slope failures of "50 to 1,000 cubic yards may occur"). Thus because the analyses of water quality in the DES and FEIS ignore the predictions of slope failure contained in those same documents, those analyses misleadingly understate levels of sedimentation likely to result from construction of the Chimney Rock Section.

Furthermore, both the FEIS and DES recognize the uncertainty involved in predicting landslide occurrence and resulting sedimentation. See Def.Ex. G, at 46; Def.Ex. E, at 147. Neither document, however, discusses the risks derived from such uncertainty in terms of potential impacts on water quality and fish habitat in Blue Creek. An EIS must reveal the risks of uncertainty if they appear substantial. See, e.g., State of Alaska v. Andrus, 580 F.2d 465, 473 (D.C.Cir.), vacated in part, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978).

Second, the FEIS and DES fail to discuss the cumulative impact of construction of the Chimney Rock Section and implementation of the Management Plan on water quality and fish habitat in Blue Creek. It is well established that an EIS must discuss the cumulative impact of the proposed action and of "reasonably foreseeable future actions." 40 C.F.R. § 1508.7 (1981); see Kleppe v. Sierra Club, 427 U.S. 390, 410 & n. 20, 96 S.Ct. 2718, 2730 & n. 20, 49 L.Ed.2d 576 (1976); South Louisiana Environ. Coun. v. Sand, 629 F.2d 1005, 1015–16 (5th Cir. 1980); Colony Fed. Sav. & Loan v. Harris, 482 F.Supp. 296, 302 (W.D.Pa.1980); 40 C.F.R. §§ 1508.25(a)(2), (c) (1981); 40 C.F.R. § 1500.8(a)(1) (1978); see also Coalition for Canyon Preservation v. Bowers, 632 F.2d 774, 783 (9th Cir.1980). Otherwise, an EIS could fail to disclose "individually minor but collectively significant" adverse en-

---

11. Thus, the FES and DES adequately disclose the possible geologic impacts of construction but then fail to disclose the probable adverse effect of those impacts on water quality and fish habitat in Blue Creek.

vironmental impacts.[12] 40 C.F.R. § 1508.7 (1981).

Various land use plans urging timber harvesting in the Blue Creek Unit were proposed years before the Forest Service prepared the DES and FEIS for the Chimney Rock Section. *See* Def.Ex. A (Blue Creek DES). Thus, at the time those documents were prepared, the Management Plan was a "reasonably foreseeable future action" within the meaning of 40 C.F.R. § 1508.7 (1981). Nevertheless, and despite the Forest Service's prediction that the Management Plan would adversely affect aquatic resources in Blue Creek (Def.Ex. C, at 196), neither the FEIS nor the DES discuss the cumulative impact of construction of the road and implementation of the Management Plan on water quality and fish habitat in Blue Creek. *See* Def.Ex. G, at 47, 49–50; Def.Ex. E, at 82–83, 88. Furthermore, the cumulative effects of the two projects on water quality would be significant (Tr. at 956–57). Natural sedimentation in Blue Creek is sufficiently high that even a small increase would impair the emergence and survival of young anadromous fish (Tr. at 948). The failure of the FEIS and DES to discuss this cumulative impact renders them inadequate under NEPA. *See, e.g., Natural Resources Defense Coun. v. Callaway,* 524 F.2d 79, 87–90 (2d Cir.1975); *Natural Resources Defense Coun. v. Grant,* 355 F.Supp. 280, 288–89 (E.D.N.C.1973).

Third, the FEIS and DES for the Chimney Rock Section fail adequately to describe measures to mitigate adverse impacts on water quality and fish habitat in Blue Creek. An EIS must discuss "[m]eans to mitigate adverse environmental impacts" of the proposed action. 40 C.F.R. § 1502.16(h)

(1982); *see Prince George's County v. Holloway,* 404 F.Supp. 1181, 1187 (D.D.C.1975); *Simmans v. Grant,* 370 F.Supp. 5, 21–22 (S.D.Tex.1974); *cf. Foundation for N. Am. Wild Sheep v. United States,* 681 F.2d 1172, 1180–82 (9th Cir.1982) (EIS required where mitigation measures insufficiently supported by data and analysis). Rather than identifying what mitigation measures would be used and providing a reasoned basis for its conclusion that they would be effective, the FEIS simply asserts that "[t]he use of the BMP's [Best Management Practices] should minimize any increased sedimentation in Blue Creek" (Def.Ex. G, at 47). The DES similarly fails to describe or analyze any mitigation measures other than by listing a few terms and phrases [13] (Def.Ex. E, at 492). The general invocation of the term "Best Management Practices" does not satisfy the NEPA requirement that an EIS discuss measures to mitigate the proposed action's adverse environmental impacts.

### B. *The Blue Creek Management Plan*

■ Plaintiffs also assert that the DES (Def.Ex. A), SDES (Def.Ex. B), and FES (Def.Ex. C) prepared for the Blue Creek Management Plan are inadequate on the grounds that: (1) their cost-benefit analysis contains certain economic distortions; (2) a supplemental EIS should have been prepared for the Management Plan; (3) they inadequately describe measures to mitigate adverse impacts on water quality in Blue Creek; and (4) they inadequately discuss the impact of the Management Plan on the wilderness resource potential of the Blue Creek Unit.

---

**12.** Any such failure could be the cause of flawed decisionmaking in the future. For example, one justification defendants offer for constructing the Chimney Rock Section is to improve access to timber in the Blue Creek Unit. If the road were built in part to serve that goal, and without consideration of cumulative impacts, subsequent timber harvesting in the Unit might be rejected based on the then apparent cumulative adverse effect of both actions on water quality in Blue Creek. Perhaps more likely, the expenditure of resources to construct the road might then be asserted as a

justification for timber harvesting in the Unit regardless of the environmental consequences. *See, e.g.,* Def. Administrative Record, Ex. I–11, at 1 ("Forest Service actions since the 1960's, in constructing segments of the G–O Road, have apparently foreclosed every alternative to the Chimney Rock Section that might otherwise be feasible and prudent.").

**13.** *E.g.,* "Import topsoil," "Mulch," and "Employ good planting methods." Def.Ex. E, at 492.

### 1. *Cost-Benefit Analysis*

Plaintiffs urge that the cost-benefit analysis of the Management Plan contained in the FES (Def.Ex. C, App. G) contains economic distortions that render it inaccurate and misleading. Specifically, they assert that increases in timber harvesting costs and decreases in the price of timber since 1975 cast doubt on whether it is economically feasible to harvest timber in the Blue Creek Unit.

These variations in the costs and prices associated with timber harvesting are not so large as to invalidate the FES. Some fluctuations in costs and prices between the preparation of a FES and commencement of the project is inevitable (Tr. at 1148). In addition, because the Management Plan proposes timber harvesting over an 80 year period, the Forest Service must decide whether a particular sale is likely to be profitable at the time that sale is proposed. Thus, the cost-benefit analysis contained in the FES satisfies the requirements of NEPA.

### 2. *Supplemental Environmental Impact Statement*

Plaintiffs contend that a supplemental EIS should have been prepared for the 1981 Management Plan because that Plan modified the 1975 FES by reducing the amount of timber to be harvested from the Blue Creek Unit by approximately 21% and increasing the amount of acreage devoted to watershed protection and "Indian Cultural Areas." Def.Ex. J, at 3–4. NEPA requires preparation of a supplemental EIS if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns * * * *" 40 C.F.R. § 1502.9(c)(1) (1982).

The Management Plan, adopted in 1981, modified Alternative E of the 1975 FES by reducing the amount of timber to be harvested from the Blue Creek Unit. Plaintiffs do not argue that these modifications would have adverse environmental impacts. On the contrary, decreasing the quantity of timber to be harvested from the Unit would lessen the adverse impacts of the proposed Management Plan. Requiring a further EIS under these circumstances in addition to the DES, SDES, and FES already prepared by the Forest Service would not serve the purposes of NEPA, but would penalize the Forest Service for attempting to accommodate the religious and environmental concerns of plaintiffs.

### 3. *Mitigation Measures*

Plaintiffs assert that the FES fails to discuss measures to mitigate the adverse impact of the Management Plan on water quality in Blue Creek. Regulations in effect at the time the 1975 FES was prepared require that an EIS contain "a clear statement of how * * * avoidable adverse effects * * * will be mitigated." 40 C.F.R. § 1500.8(a) (1973); *see Prince George's County, supra,* 404 F.Supp. at 1187; *Simmans, supra,* 370 F.Supp. at 21–22.

The FES acknowledges that "[t]he projected sediment increases of four to 19 percent [resulting from the Management Plan] would have an adverse effect upon the aquatic resource [in Blue Creek]," but discusses mitigation measures only by asserting that "[t]his [adverse] impact would be mitigated by progressive stabilization of the watershed in the years immediately following disturbances" (Def.Ex. C, at 196). This assertion neither identifies what specific mitigation measures will be taken nor evaluates the efficacy of those measures.[14] This failure renders the FES deficient under NEPA.

### 4. *Wilderness Resource*

Plaintiffs contend that the failure of the FES to assess the impact of the Management Plan on the wilderness resource potential of the Blue Creek roadless area as part of the larger contiguous roadless area consisting of the Blue Creek, Eightmile, and Siskiyou roadless areas violates both NEPA and the Wilderness Act, 16 U.S.C. § 1132(b). NEPA requires that an EIS disclose the impact of a proposed action on the wilderness resource potential

---

**14.** Although the 1981 Management Plan does propose the use of stream protective zones, it fails to evaluate the effectiveness of such zones in reducing sedimentation. *See* Def.Ex. J, at 2.

of any area eligible for inclusion in the National Wilderness Preservation System. *California v. Block,* 690 F.2d 753, 764 (9th Cir.1982). Congress created that system in 1964 to provide statutory protection for "areas that are relatively untouched by humankind. 16 U.S.C. § 1131 (1976)." *Id.* at 757. Similarly, the Wilderness Act requires the Forest Service to review "for preservation as wilderness, each area in the national forests classified * * * as 'primitive' and report [its] findings to the President." 16 U.S.C. § 1132(b).

The FES evaluates the impact of the Management Plan on the suitability for wilderness designation of the Blue Creek, Eightmile, and Siskiyou roadless areas as separate areas rather than as a potential single wilderness area on the ground that "[t]he Blue Creek roadless area is separated from the Eightmile and Siskiyou roadless units by a corridor containing a low standard road which is [in] the general location of the proposed Gasquet-Orleans road." Def.Ex. C, at 82; *see id.* at 88–96. Similarly, the Forest Service denied plaintiffs' administrative appeal of this issue on the ground that

> Blue Creek was "separated" from Eight Mile during the RARE I inventory on the premise that a primitive road suitable only for 4-wheel drive vehicles separates them. The decision to treat the Eight Mile roadless area and the Blue Creek roadless area as distinct entities was made during the RARE I inventory process, and validated by the RARE I FES (October 1973) and the subsequent decision (in October 1976) to adopt the Blue Creek Plan. This Plan as it treats roadless area evaluation is consistent with the RARE I process: It merely incorporates RARE I results. Therefore, on the basis of timeliness, the decision to consider the Blue Creek roadless area as a separate area in the Plan is not a matter open to appeal.

Def.Ex. I–1(6), at 2.

The Forest Service's separation of the Blue Creek roadless area from the Eightmile and Siskiyou roadless areas for purposes of evaluating the wilderness potential of those areas is inconsistent with Forest Service guidelines governing that agency's inventory of all roadless and undeveloped lands in the National Forest System pursuant to the Wilderness Act. Forest Service Manual (FSM) § 8260(B)(3)(a)(1) defines "roadless area" as "[a]n area of undeveloped Federal Land within which there are not improved roads maintained for travel by means of motorized vehicles intended for highway use" (Def.Ex. RR, at 3). Defendants acknowledge that the "jeep trail" that currently connects the Dillon-Flint and Summit Valley Sections of the G–O road does not constitute an "improved road" within the meaning of FSM § 8260(B)(3)(a)(1). Def.Ex. E, at 8; Tr. at 1267–68, 1323. That trail cannot be traversed by standard, non-four-wheel drive motor vehicles. *See* Def.Ex. E, at 8; Tr. at 1047–51.

Furthermore, the existing jeep trail should not preclude evaluation pursuant to NEPA of the Blue Creek, Eightmile, and Siskiyou roadless areas as a potential single wilderness area. The three areas are contiguous and constitute a single wilderness area for recreational and environmental purposes (Tr. at 1035–36, 1058–59). Moreover, in time the existing trail will become overgrown with vegetation (Tr. at 1306). The separation of these roadless areas for evaluation as potential wilderness artificially lowered the wilderness "ratings" given these areas by the Forest Service in the FES, and thus reduced the likelihood that the Forest Service would recommend the Blue Creek roadless area for preservation as wilderness (Tr. at 1036–47). This bias against preservation of the Blue Creek Unit as wilderness renders the FES inadequate under NEPA.

The Forest Service's denial of plaintiffs' administrative appeal of this issue on the ground of "untimeliness" was in error. The fact that the Forest Service assumed that these areas were separated when it performed the Roadless Area Review and Evaluation (RARE I) does not estop plaintiffs from challenging the adequacy of the

FES on this ground. Over five years ago the Forest Service itself rejected the contention that the existence of a primitive road precludes designation of surrounding lands as a single roadless and wilderness area. *See* Def.Ex. RR. Under these circumstances, NEPA and the Wilderness Act require that the Forest Service properly assess the impact of the Management Plan on the suitability of the Blue Creek, Eightmile, and Siskiyou roadless areas for designation as a single wilderness area.[15] *See Parker v. United States,* 309 F.Supp. 593, 602 (D.Colo.1970), *aff'd,* 448 F.2d 793 (10th Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (1972).

### IV. *National Historic Preservation Act*

■ Section 106 of the National Historic Preservation Act (NHPA), 16 U.S.C. § 470f, as amended, requires that "[t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal * * * undertaking * * * shall, prior to the approval of the expenditure of any Federal funds on the undertaking * * *, take into account the effect of the undertaking on any district, site, building, structure, or object that is included or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic preservation * * * a reasonable opportunity to comment with regard to such undertaking."

The Helkau District, which consists of 13,500 acres located in the high country, was placed on the National Register of Historic Places in 1981. Prior to 1981, the high country was eligible for inclusion on the National Register. Accordingly, the Forest Service afforded the Advisory Council the opportunity to comment on the Blue Creek DES and FES. *See* Def.Ex. GG–1 & GG–2. Plaintiffs assert that the 1981 Management Plan constitutes a separate proposed "undertaking" that the Forest Service was required to submit to the Advisory Council for comment.

The Management Plan modifies Alternative E of the FES by increasing the size of the proposed "Indian Cultural Areas," increasing the size of the proposed "Stream Channel Protection" zones, and correspondingly decreasing the amount of timber to be harvested from the Blue Creek Unit. The Management Plan does not otherwise alter the recommendations of the FES, and hence simply refines a proposal "previously considered [by the Advisory Council] under Section 106 [of the NHPA]." 36 C.F.R. § 800.2(c) (1981). The modifications the Management Plan does propose would lessen its adverse impact on the Helkau District. Under these circumstances, requiring additional comment by the Advisory Council would serve no purpose and is not required by the NHPA.

### V. *Federal Water Pollution Control Act*

■ Plaintiffs contend that construction of the Chimney Rock Section and/or implementation of the Management Plan would increase sedimentation in Blue Creek in violation of the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1251 *et seq.* The FWPCA requires each state to implement its own water quality standards. 33 U.S.C. § 1313; *see Natural Resources Defense Coun. v. Costle,* 564 F.2d 573, 575–76 (D.C.Cir.1977). Federal agencies must comply with those standards. 33 U.S.C. § 1323. In California, water quality standards are determined by Regional Water Quality Control Boards. Cal.Water Code §§ 13170, 13240–41 (1982). Those standards governing water quality in Blue Creek are set forth in the North Coast Regional Water Quality Control Board's "Water Quality Control Plan for Klamath River Basin 1–A" (1982) (the Water Quality Control Plan).

The Water Quality Control Plan establishes several "water quality objectives" deemed "of particular importance in protecting beneficial uses from unreasonable effect due to discharges from logging, construction, or associated activities * * * * *"

---

**15.** The FEIS for the Chimney Rock Section of the G–O road similarly fails properly to evaluate the impact of that action on potential wilderness resources, *see* Def.Ex. G, at 50–51, and is therefore invalid under NEPA.

Water Quality Control Plan, at 57. These "water quality objectives" are "the limits or levels of water quality constituents or characteristics which are established for the reasonable protection of beneficial uses of water * * * *" *Id.* at 58. Two of these standards are relevant to the present case. First, the Water Quality Control Plan provides that "[t]urbidity shall not be increased more than 20 percent above naturally occurring background levels."[16] *Id.* at 57. Second, it requires that "[t]he suspended sediment load and suspended discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses." *Id.*

Construction of the Chimney Rock Section and/or implementation of the Management Plan would violate both of these water quality standards. Construction of the road would increase sediment levels in Blue Creek far in excess of the ceiling of 20% above background levels established by the Water Quality Control Plan (Tr. at 444). Further, this increase would adversely affect fish spawning habitat in Blue Creek, thereby reducing anadromous fish production in the Klamath River system (Tr. at 942–44, 948).[17] Similarly, implementation of the Management Plan would result in a large increase in sediment levels in Blue Creek in violation of state water quality standards[18] (Tr. at 494–95, 804). This increase in sediment would also reduce the survival rate of anadromous fish eggs laid in the spawning gravels of Blue Creek (Tr. at 976). Consequently, either proposed project would violate the FWPCA.

**16.** "Turbidity" refers to the opaqueness of water, *see* Def.Ex. G, at 112, and is directly correlated with suspended sediment, Def.Ex. C, at 194 n. 1.

**17.** Anadromous fish species bury their eggs under a shallow layer of gravel. If sufficient levels of suspended sediment then settle over the spawning gravel, the eggs are deprived of oxygen and, even if they survive and hatch, the young fish may be unable to emerge from under this layer of sediment. *See* Tr. at 937–40. Once the level of tolerance of the fish for such sediment is reached, a 1% increase in sediment

## VI. Indian Reserved Water and Fishing Rights

Plaintiffs assert that construction of the Chimney Rock Section and/or implementation of the Management Plan would violate water and anadromous fishing rights reserved to Indians on the Hoopa Valley Indian Reservation (Hoopa Reservation) when that reservation was established. They also claim that such construction would violate defendants' duty, as trustees for the Indians, to protect those rights. Spawning gravels in Blue Creek provide a significant portion of the anadromous fish production of the Klamath River (Tr. at 879–81). Thus, the adverse impact of either project on water quality and fish habitat in Blue Creek (*see* Part V, *supra*) would significantly decrease the quantity of anadromous fish present in those portions of the Klamath River that flow through the Hoopa Reservation. *See United States v. State of Washington,* 506 F.Supp. 187, 208 (W.D. Wash.1980), *modified,* 694 F.2d 1374 (9th Cir.1982); *id.,* 694 F.2d at 1383–84; *see also* 25 C.F.R. Part 250 (1982) (regulating exercise of fishing rights by Indians on Hoopa Reservation). This violation in turn constitutes a breach of defendants' trust responsibility towards those Indians. *See, e.g., Pyramid Lake Paiute Tribe v. Morton,* 354 F.Supp. 252 (D.D.C.1973).

## VII. Administrative Procedure Act

Plaintiffs contend that defendants violated the standards governing administrative agency action contained in the Administrative Procedure Act (APA), 5 U.S.C. § 706. The violations of NEPA, the Wil-

may reduce fish emergence by as much as 4%. Tr. at 943–44.

**18.** The Blue Creek FES estimates that the Management Plan would result in an "average" increase in sediment in Blue Creek of 10% over the first 10 years and 7% over the first 80 years. Def.Ex. C, at 194–95. The evidence does not support these estimates. *See* Tr. at 494–95, 804. Even if it did, an average increase in sediment over such long periods of time assures neither that state water quality standards will be obeyed nor that fish habitat will be safeguarded. *See* Tr. at 494.

derness Act, the FWPCA, Indian water and fishing rights, and plaintiffs' First Amendment rights detailed above also constitute violations of the APA. *See* 5 U.S.C. §§ 706(2)(A), (B), & (D). The Court finds no additional violations of that Act. The "arbitrary and capricious" standard of review is a narrow one. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The Forest Service decisions under review were based upon consideration of the relevant factors, and hence were not arbitrary and capricious. *Id.*

### VIII. *Multiple Use, Sustained Yield Act*

■ Plaintiffs argue that the proposed Chimney Rock Section and Management Plan violate the Multiple-Use, Sustained-Yield Act, 16 U.S.C. §§ 528–31. That Act declares a national policy to manage national forest lands for multiple uses without impairing the long-term productivity of those lands. 16 U.S.C. § 531. In the present case, the Forest Service attempted to balance various competing uses for the Blue Creek Unit. This consideration for multiple uses satisfies the requirements of the Multiple Use, Sustained Yield Act. *See Sierra Club v. Hardin,* 325 F.Supp. 99, 123–24 (D.Alaska 1971).

### IX. *National Forest Management Act of 1976*

■ Plaintiffs contend that the proposed Forest Service actions would violate the National Forest Management Act of 1976 (NFMA), 16 U.S.C. §§ 1600–14. Like the Multiple Use, Sustained Yield Act, the NFMA requires that national forest lands be managed with due consideration given to environmental values. *See* 36 C.F.R. Part 219 (1982). Here, the balance of competing values struck by the Forest Service in proposing to construct the Chimney Rock Section and implement the Management Plan was not so insensitive to environmental concerns that it violates the NFMA.

In light of all the foregoing,

IT IS HEREBY ORDERED that defendants are permanently enjoined from constructing the Chimney Rock Section of the G–O road and/or any alternative route for that Section which would traverse the high country, which high country constitutes the following land sections in Six Rivers National Forest:

T 14 N, R 3 E, sections 35, 36;

T 14 N, R 4 E, sections 21, 22, 23, 26, 27, 28, 29, 31, 32, 33, 34, 35;

T 13 N, R 4 E, sections 2, 3, 4, 5, 6, 7, 8; and

T 13 N, R 3 E, sections 1, 2, 11, 12, 13, 14.

IT IS FURTHER HEREBY ORDERED that defendants are permanently enjoined from engaging in commercial timber harvesting and/or from constructing any logging roads in the high country, as described above, pursuant to the 1981 Implementation Plan (Def.Ex. J) or any other land management plan.

IT IS FURTHER HEREBY ORDERED that defendants are permanently enjoined from engaging in commercial timber harvesting or the construction of logging roads in the 31,100 acre Blue Creek Roadless Area unless and until defendants prepare and circulate for public comment a supplemental environmental impact statement, or a new environmental impact statement, for the Blue Creek Management Plan, which adequately evaluates the wilderness resource potential of that Area as part of the contiguous Blue Creek, Eightmile, and Siskiyou Roadless Areas.

IT IS FURTHER HEREBY ORDERED that defendants are permanently enjoined from engaging in commercial timber harvesting and/or from constructing any logging roads in any part of the Blue Creek Unit of Six Rivers National Forest unless and until defendants have done the following:

(a) Prepared and circulated for public comment a supplemental environmental impact statement, or a new environmental impact statement, for the proposed Blue Creek Management Plan, which adequately specifies effective measures to mitigate the adverse impact of proposed

logging activities on water quality and fish habitat in Blue Creek; and

(b) Completed and made available to all interested parties studies demonstrating that proposed logging activities (1) would not violate the Federal Water Pollution Control Act, and (2) would not reduce the supply of anadromous fish present in those portions of the Klamath River that flow through the Hoopa Valley Indian Reservation.