795 F.2d 688
 24 ERC 1775, 17 Envtl. L. Rep. 20,021
 NORTHWEST INDIAN CEMETERY PROTECTIVE ASSOCATION, et al.,
Plaintiffs-Appellees,
v.
R. Max PETERSON, Chief, U.S. Forest Service, et al.,
Defendants-Appellants.
STATE OF CALIFORNIA, Plaintiff-Appellee,
v.
John R. BLOCK, Secretary, U.S. Department of Agriculture, et
al., Defendants- Appellants.
Civ. A. No. 83-2225.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 9, 1984.
Decided June 24, 1985.
Decision Withdrawn and Rehearing Granted July 22, 1986.
Decided July 22, 1986.
 
 Edna Walz, Deputy Atty. Gen., Sacramento, Cal., Marilyn B. Miles, California Indian Legal Services, Eureka, Cal., Michael R. Sherwood, Sierra Club Legal Defense Fund, San Francisco, Cal., for plaintiffs-appellees.
 Rodney Hamblin, Asst. U.S. Atty., San Francisco, Cal., Jacques B. Gelin, Robert Klarquist, Attys., U.S. Dept. of Justice, Washington, D.C., for defendants-appellants.
 Appeal from the United States District Court for the Northern District of California.
 Before DUNIWAY, CANBY and BEEZER, Circuit Judges.
 ON REHEARING
 CANBY, Circuit Judge:
 
 
 1
 These consolidated actions contest the plans of the United States Forest Service ("Forest Service") to permit timber harvesting and to construct a road in the Blue Creek Unit of the Six Rivers National Forest in California. The Blue Creek Unit consists of 76,500 acres located in the Siskiyou Mountains. The Forest Service has inventoried approximately 31,500 of these acres as a roadless area.[1] On its northern boundary, the Blue Creek Unit adjoins the Eightmile and Siskiyou inventoried roadless areas. Blue Creek, the stream after which the Unit was named, flows into the Klamath River and contains important spawning habitat for several anadromous fish species. Northwest Indian Cemetry Protective Ass'n. v. Peterson, 565 F.Supp. 586, 590 (N.D.Cal.1983).
 
 
 2
 Contained within the Blue Creek Unit is an area known as the "high country," which is considered sacred by Yurok, Karok, and Tolowa Indians who live in the surrounding region. Although the Indians use specific sites within the "high country" for prayer and religious purposes, the sacred area encompasses the entire region, not just the individual sites. Id. at 591.
 
 
 3
 In 1972, the Forest Service began to prepare a multiple-use management plan and environmental impact statement (EIS) for the management of the Blue Creek and Eightmile Planning Units within the Six Rivers National Forest. In 1974 and 1975, the Forest Service circulated a draft, supplemental draft and final EIS which proposed various land use management plans for the Blue Creek Unit. In 1981, the "Blue Creek Unit Implementation Plan" (Management Plan) proposed to permit harvesting of 733 million board feet of Douglas fir from the Blue Creek Unit over an 80 year period.
 
 
 4
 In 1977, the Forest Service issued another draft EIS that proposed alternative routes to complete construction of the last 6.02 miles (Chimney Rock Section) of a paved road from Gasquet, California to Orleans, California (G-O Road). In 1982, the final EIS was issued for the proposed construction of the Chimney Rock Section through the Blue Creek Unit.
 
 
 5
 Plaintiffs objected to both proposed projects and, after exhausting administrative remedies, filed these actions in the district court. Northwest Indian Cemetery Protective Association, et al. v. Peterson was brought by the Northwest Indian Cemetery Protective Association (seven non-profit corporations and unincorporated associations), four individual plaintiffs of American Indian heritage, and two Sierra Club members. State of California v. Block was brought by the State of California acting through its Native American Heritage Commission. The complaints alleged that the Forest Service decisions to construct the Chimney Rock Section of road and to timber the Blue Creek Unit violated: (1) the first amendment of the United States Constitution; (2) the American Indian Freedom of Religion Act of 1978 (AIFRA), 42 U.S.C. Sec. 1996; (3) the National Environmental Policy Act (NEPA), 42 U.S.C. Sec. 4321 et seq., and the Wilderness Act, 16 U.S.C. Sec. 1131 et seq.; (4) the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. Sec. 1251 et seq.; (5) water and fishing rights reserved to American Indians on the Hoopa Valley Indian Reservation, and defendants' trust responsibility to protect those rights; (6) the Administrative Procedure Act (APA), 5 U.S.C. Sec. 706; (7) the Multi-Use Sustained-Yield Act, 16 U.S.C. Secs. 528-531; and (8) the National Forest Management Act of 1976, 16 U.S.C. Sec. 1600 et seq.
 
 
 6
 Prior to trial, the district court denied plaintiffs' motion for a preliminary injunction on the understanding that no road construction would begin prior to a ruling on the merits. Northwest Indian Cemetery Protective Ass'n. v. Peterson, 552 F.Supp. 951 (N.D.Cal.1982). After a full trial on the merits, the district court found that the challenged Forest Service decisions violated: (1) the first amendment; (2) NEPA and the Wilderness Act; (3) FWPCA; (4) Indian water and fishing rights on the Hoopa Valley Indian Reservation, and defendants' trust responsibility to protect those rights; and (5) the Administrative Procedure Act. Northwest Indian Cemetery Protective Ass'n. v. Peterson, 565 F.Supp. at 591. The district court accordingly issued an injunction: (1) preventing construction of the G-O road and any timber harvesting or construction of logging roads in the high country; (2) preventing timber harvesting or construction of logging roads in the Blue Creek Roadless Area until an EIS was prepared evaluating its wilderness potential as part of adjoining roadless areas; and (3) enjoining timber harvesting and construction of logging roads anywhere in the Blue Creek Unit until an EIS was prepared specifying adequate measures to mitigate the impact of those activities on water quality and fish habitat in Blue Creek, and until studies were completed demonstrating that the proposed logging activities would not violate the FWPCA or reduce the supply of anadromous fish to the Hoopa Valley Indian Reservation. Id. at 606. The government appealed.
 
 
 7
 While the appeal was pending in this court, Congress enacted the California Wilderness Act of 1984, Pub.L. No. 98-425, 98 Stat. 1619 (1984), which was signed by the President on September 28, 1984. The Act places in wilderness, and out of the reach of logging, most but not all of the high country encompassed by that part of district court's injunction that is based on the first amendment. The Act left open a 1200 foot-wide corridor for completion of the G-0 Road, but Congress appears to have intended not to take any position on whether the Road should be completed. See H.R. Rep. No. 98-40, 98th Cong., 1st Sess. 32; S.Rep. No. 98-582, 98th Cong., 2d Sess. 29; 130 Cong.Rec. No. 113, pp. 18-19 (H.Rep. Sept. 12, 1984) (Remarks of Cong. Seiberling).
 
 ISSUES
 
 8
 On this appeal we address the following issues raised by the Forest Service:[2]
 
 
 9
 (1) Whether the district court erred in enjoining road construction and timbering in the high country of the Blue Creek Unit on the ground that such activity would impermissibly burden the Indian plaintiffs' first amendment right to the free exercise of their religion;
 
 
 10
 (2) Whether the district court erred in holding that the EISs prepared for the road and land management plans failed adequately to discuss the effects on water quality of the proposed actions;
 
 
 11
 (3) Whether the district court erred in holding that Forest Service's proposed actions would violate the Federal Water Pollution Control Act and state water quality standards.
 
 DISCUSSION
 I. First Amendment
 
 12
 The first amendment prohibits governmental actions that burden an individual's free exercise of religion unless those actions are necessary to fulfill a governmental interest of the highest order that cannot be met in a less restrictive manner. See Wisconsin v. Yoder, 406 U.S. 205, 214-15, 92 S.Ct. 1526, 1532-33, 32 L.Ed.2d 15 (1972); Sherbert v. Verner, 374 U.S. 398, 403-09, 83 S.Ct. 1790, 1793-96, 10 L.Ed.2d 965 (1963). In this case the government challenges the district court's conclusion that certain proposed Forest Service management decisions, if implemented, would impermissibly burden the Indian plaintiffs' free exercise rights. Further, the government contends that even if its action would impose such a burden, it has demonstrated a governmental interest sufficient to override the Indians' religious interests.
 
 A. Free Exercise Right
 
 13
 To establish a constitutionally valid free exercise claim, the Indian plaintiffs have the initial burden of demonstrating that governmental actions create a burden on their rights.[3] See School District of Abington Township v. Schempp, 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963); Wilson v. Block, 708 F.2d 735, 740 (D.C.Cir.), cert. denied, 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983). That the Indians use the Blue Creek high country area for religious purposes and consider the area sacred is not enough to characterize the contemplated Forest Service actions as a burden on free exercise rights. The Indians have to show that the area at issue is indispensable and central to their religious practices and beliefs, and that the proposed governmental actions would seriously interfere with or impair those religious practices. Wilson v. Block, 708 F.2d at 742-44; Sequoyah v. TVA, 620 F.2d 1159, 1164 (6th Cir.), cert. denied, 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 216 (1980); Crow v. Gullet, 541 F.Supp. 785, 792 (D.S.D.1982), aff'd, 706 F.2d 856 (8th Cir.), cert. denied, 464 U.S. 977, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983).
 
 The district court here found that
 
 14
 [f]or generations, individual members, spiritual leaders, and medicine persons of the Yurok, Karok, and Tolowa tribes have traveled to the high country to communicate with the "great creator," to perform rituals, and to prepare for specific religious and medicinal ceremonies. Such use of the high country is "central and indispensable" to the Indian plaintiffs' religion....
 
 
 15
 Communication with the "great creator" is possible in the high country because of the pristine environment and opportunity for solitude found there. Construction of the Chimney Rock Section and/or the harvesting of timber in the high country, including "clear-cutting," would seriously damage the salient visual, aural, and environmental qualities of the high country. The Forest Service's own study concluded that "[intrusions on the sanctity of the Blue Creek high country are ... potentially destructive of the very core of Northwest [Indian] religious beliefs and practices."[4]
 
 
 16
 We agree with the district court that the proposed operations would interfere with the Indian plaintiffs' free exercise rights.
 
 
 17
 There is a great deal of evidence in the record that the high country[5] is indispensable to a significant number of Indian healers and religious leaders as a place where they receive the "power" that permits them to fill the religious roles that are central to the traditional religions. There is abundant evidence that the unitary pristine nature of the high country is essential to this religious use.[6] Finally, there is much evidence that the religious lives of many other Indians depends upon the services of those leaders who have received the necessary "power" in the high country. On all of these points, there is virtually no evidence to the contrary.
 
 
 18
 The record also amply supports, indeed virtually compels, the conclusion that logging and the construction of logging roads would be utterly inconsistent with the Indians' religious practices. Because most of the high country has now been designated by Congress as a wilderness area, the issue of logging becomes less significant, although it does not disappear. The question of the completion of the G-0 Road, however, retains its full vitality.
 
 
 19
 A substantial part of the evidence relied upon by the district court was the report prepared for the Forest Service by Dr. Theodoratus, Cultural Resources of the Chimney Rock Section, Gasquet-Orleans Road, Six Rivers National Forest (1979) ("Theodoratus Report"). That Report was not at all equivocal about the Road:
 
 
 20
 [T]he completion of the G-O Road via any of the proposed Chimney Rock alternatives (Routes 1-9) will produce an irreparable impact on the spiritual and physical well-being of the adjacent Yurok, Karok and Tolowa communities. Such impact will be created through the degradation of salient environmental qualities pertinent to the power quests of medicinal and spiritual practitioners who serve these communities. It is recommended, therefore, that such an impact is, in fact, sufficient to justify the rejection of all proposed routes (Routes 1-9) of the Chimney Rock section of the G-O Road.
 
 
 21
 Id. at 422 (emphasis original). While much of the adverse impact would be indirect, from increased uses made possible by the Road, the geographic and design features of the Road itself supply part of the impact. Id. at 417. At least one witness testified that noise levels from the proposed Road would interfere with religious uses of the high country. We conclude that the Indian plaintiffs demonstrated that the Road would interfere with the free exercise of their religion.
 
 
 22
 The fact that the proposed government operations would virtually destroy the plaintiff Indians' ability to practice their religion differentiates this case from Bowen v. Roy, --- U.S. ---, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986). There the Court held that an Indian could not, on religious grounds, prevent the government from using a social security number that it had assigned to the Indian's child for purposes of providing governmental benefits. The Court stated: "The Federal Government's use of a Social Security number for Little Bird of the Snow does not itself in any degree impair [her father's] 'freedom to believe, express, and exercise' his religion." 54 U.S.L.W. at 4606. The Court also pointed out that the plaintiff was seeking to attack the government's conduct of its own internal operations, simply because they offended his religious sensibilities.[7] Here, however, the proposed road-building and logging operations would greatly impair religious exercises of the plaintiff Indians in the only place where they can be performed. In addition, logging and road-building on public lands, to which the public has access, is not the kind of internal governmental practice that the Court found beyond free exercise attack in Roy.
 
 
 23
 We also reject the government's argument that the free exercise clause cannot be violated unless the governmental activity in question penalizes religious beliefs or practices. Governmental action that makes exercise of first amendment rights more difficult or impedes religious observances may also be " 'invalid even though the burden may be characterized as being only indirect.' " Sherbert v. Verner, 374 U.S. at 404, 83 S.Ct. at 1794, (quoting Braunfeld v. Brown, 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961) (plurality opinion) ); see Scott v. Rosenberg, 702 F.2d 1263, 1273-74 (9th Cir.1983), cert. denied, 465 U.S. 1078, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984).
 
 B. Establishment Clause
 
 24
 The government does not challenge the sincerity of the Indians' beliefs nor their religious character. It even concedes that the Indians' use of the high country for religious purposes is entitled to some first amendment protection. Northwest Indian Cemetery Protection Ass'n. v. Peterson, 565 F.Supp. at 594. Indeed, the Forest Service plans to erect buffer zones to protect eleven sites with identified historical and ritual use. It argues that any greater protection of the area requires the government, in effect, to manage and maintain the area as a religious preserve for a single group in violation of the establishment clause.
 
 
 25
 The government substantially overstates its case and argues far beyond the reach of the district court's injunction. The district court's order permanently enjoins the Forest Service only from completing the G-O Road and from engaging in commercial timber harvesting and constructing logging roads in the high country. 565 F.Supp. at 606. The Forest Service remains free to administer the high country for all other designated purposes including outdoor recreation, range, watershed, wildlife and fish habitat and wilderness. See 16 U.S.C. Sec. 1604(e)(1). The Forest Service would not, by virtue of this injunction, sponsor or become entangled in religious matters in violation of the establishment clause. Nor is the Forest Service being required to police the conduct of visitors to prevent their interfering with Indian religious observances, a proposal rejected in Badoni v. Higginson, 638 F.2d 172, 179 (10th Cir.1980), cert. denied, 452 U.S. 954, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981).
 
 
 26
 Moreover, managing the National Forest so as not to burden genuine Indian religious beliefs and practices is not an endorsement or advancement of that religion but evidences a policy of neutrality. See Walz v. Tax Commission of New York City, 397 U.S. 664, 669, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). The Constitution encourages accommodation, not merely tolerance, of all religions and forbids hostility toward any. See Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). It is in this spirit that Congress passed the American Indian Religious Freedom Act, 42 U.S.C. Sec. 1996, which adopted the policy of protecting and preserving traditional Indian religious beliefs and practices, including access to sites.[8]
 
 
 27
 Once a violation of the free exercise clause has occurred, as here, an effective remedy must necessarily take the protected religious exercise into account. Such a remedy ought not be condemned as a violation of the establishment clause by too literally applying the "secular purpose" and "primary effect" tests of Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). Accommodating the free exercise of religion is a valid purpose of governmental action, and promotion of that liberty is a permissible primary effect. See Wisconsin v. Yoder, 406 U.S. 205, 234 n. 22, 92 S.Ct. 1526, 1542 n. 22, 32 L.Ed.2d 15 (1972); Sherbert v. Verner, 374 U.S. 398, 409, 83 S.Ct. 1790, 1796, 10 L.Ed.2d 965 (1963); Zorach v. Clauson, 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952). Therefore, "where governmental action violates the Free Exercise Clause, the Establishment Clause ordinarily does not bar judicial relief." Wilson v. Block, 708 F.2d at 747.
 
 C. Compelling Government Interest
 
 28
 The district court ruled that the interests of the Forest Service in road construction and timber harvesting either would not be served by the proposed projects or "fall far short of constituting the 'paramount interests' necessary to justify infringement of plaintiffs' freedom of religion." 565 F.Supp. at 596. The government contends that the district court erred in not deferring to the judgment of the Secretary as to the proper purposes and management of the National Forest in light of the generality of congressional direction over the uses of the Forests.
 
 
 29
 The government's argument, and its entire approach to this issue, fails to take into account the free exercises standard that controls this case. The government makes little attempt to demonstrate that compelling governmental interests, on the facts of this case, require the completion of the paved G-O Road or the logging of the high country. Nor does the government reach the question whether those interests, if compelling, could be served in other ways that would interfere less with the Indians' religious rights. Instead, the government urges its prerogative to manage its forests in the usual way, within its statutory authority.[9]
 
 
 30
 This line of argument yields nothing to the free exercise clause. Admittedly, conventional free exercise analysis undergoes considerable strain when it is applied to site-specific religions centered on public lands. Yet the government does not take issue with those decisions that have adopted a balancing test. Those cases require the Indians first to show that the land in question is central and indispensable to the exercise of their religion and that the proposed governmental operations will interfere with that exercise; if that burden is met, then the government is required to show that its operations serve a compelling interest. See Wilson v. Block, 708 F.2d at 742-44; Sequoyah v. TVA, 620 F.2d at 1164; Badoni v. Higginson, 638 F.2d at 176-77; Crow v. Gullet, 541 F.Supp. at 792. In these cited cases, the Indian plaintiffs did not prevail. But inherent in the adoption of a balancing test is the distinct possibility that, on a different record, the Indians may prevail.
 
 
 31
 For example, in Badoni, the court found that Glen Canyon Dam, which created Lake Powell, served an overriding governmental interest. 638 F.2d at 177. In light of the magnitude of the project and the difficulty of placing it elsewhere, that ruling is not surprising. Nothing comparable has been shown by the government here to support its proposed projects. There was testimony that completion of the road and logging in the high country would increase employment in Del Norte County, but that this benefit would simply represent a shift of work from elsewhere in the state. There would be no statewide net gain in employment. There was evidence that forest management functions would be made easier by the road. There was evidence that the road would also provide greater recreational access to the area, but the projected use was not large. In our view, the government has fallen short of demonstrating the compelling interest required to justify its proposed interference with the Indian plaintiffs' free exercise rights.
 
 
 32
 II. Adequacy of the Environmental Impact Statements
 
 A. Standard of Review
 
 33
 The district court's review of an EIS is governed by the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(D); agency action may be set aside if it was undertaken without observance of procedures required by law. Lathan v. Brinegar, 506 F.2d 677, 693 (9th Cir.1974) (en banc). Courts are not to "fly speck" EISs, id., but an EIS should not be upheld if it does not " 'reasonably [set] forth sufficient information to enable the decisionmaker to consider the environmental factors and make a reasoned decision.' " Adler v. Lewis, 675 F.2d 1085, 1096 (9th Cir.1982) (citations omitted).
 
 
 34
 We review the district court's conclusion to determine whether it is based upon an erroneous legal standard or upon clearly erroneous findings of fact. Save Lake Washington v. Frank, 641 F.2d 1330, 1334 (9th Cir.1981).
 
 B. Project Effects on Water Quality
 
 35
 The district court found that the Chimney Rock draft and final EISs were inadequate because: (1) they failed sufficiently to disclose the impact of the road construction on water quality; (2) they failed to discuss the cumulative impact of the road construction and implementation of the Management Plan on water quality; and (3) they failed adequately to describe what measures would be taken to mitigate adverse impacts on water quality. In addition, the district court found that the draft, supplemental draft, and final EISs prepared for the Blue Creek Management Plan inadequately described measures to mitigate adverse impacts on water quality in Blue Creek.
 
 
 36
 The government does not take issue with the legal standards applied to the EISs by the district court. Rather, it contends that the Chimney Rock draft and final EISs do address erosion and sedimentation problems relative to road construction. The government also argues that cumulative sedimentation effects on the water quality and fishlife are disclosed in the 1975 Blue Creek EIS for both the Chimney Rock Section and the proposed Management Plan and that it was unnecessary to readdress them in the Chimney Rock EISs. Further, it claims that the EISs identify specific mitigation measures.
 
 
 37
 1. Impact of Road Construction on Water Quality
 
 
 38
 The draft and final EISs prepared for the Chimney Rock Section do address erosion and sedimentation effects of road construction on Blue Creek. The EISs state that total increased sedimentation would raise the sedimentation yield in Blue Creek by 5.5 percent, resulting in only a "small decrease" in water quality. The EISs do not, however, address increased sedimentation contributed by road-caused landslides, because of the difficulty inherent in predicting such slope failures. Thus, the potential risks to water quality stemming from the uncertainty in predicting landslides are ignored in the discussion of sedimentation effects. These risks must be revealed if they appear substantial. See State of Alaska v. Andrus, 580 F.2d 465, 473 (D.C.Cir.) vacated in part, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978).
 
 
 39
 The district court found that landslide risks were substantial and that debris from landslides triggered by the road construction would result in as much as a 500 percent increase in sediment loads in Blue Creek. These findings are not clearly erroneous. The failure to disclose such risks in the EIS renders them inadequate.
 
 
 40
 2. Cumulative Sedimentation Effects on Water Quality
 
 
 41
 The district court was correct in finding that the Chimney Rock EISs do not address cumulative sedimentation effects on water quality rising from the proposed road and timber projects. Nor did the district court ignore the 1975 Blue Creek EIS, which the government contends does address cumulative effects.
 
 
 42
 The Blue Creek EIS does not adequately discuss cumulative effects because there the effects were judged as "average" increases in sediment over a period of years. State water quality standards, however, pertain to individual amounts of turbidity at a particular time and are not written in terms of averages over years. The discussion of cumulative effects in the Blue Creek EIS is therefore inadequate and likely underestimates the actual cumulative effects of both projects on water quality.
 
 
 43
 The district court's finding that the EISs do not contain an adequate discussion of the cumulative effects of both projects on water quality is consequently not clearly erroneous.
 
 3. Mitigation Measures
 
 44
 The applicable regulations require that an EIS discuss "[m]eans to mitigate adverse environmental impacts" of the proposed action. 40 C.F.R. Sec. 1502.16(h). The Chimney Rock and Blue Creek EISs discuss mitigation measures in part, but neither EIS analyzes the mitigation measures in detail or explains how effective the measures would be. A mere listing of mitigation measures is insufficient to qualify as the reasoned discussion required by NEPA. See Adler v. Lewis, 675 F.2d at 1096. The district court's conclusion that the EISs are inadequate for this reason is sound.
 
 III. Federal Water Pollution Control Act
 
 45
 The Federal Water Pollution Control Act requires each state to implement its own water quality standards with which federal agencies must comply. See 33 U.S.C. Secs. 1313, 1323. The North Coast Regional Water Quality Control Board in California determines water quality standards for the Blue Creek area. See Water Quality Control Plan for Klamath River Basin 1A ("the Plan"). This Plan provides that "[t]urbidity shall not be increased more than 20 percent above naturally occurring background levels." Id. at 5-13. Further, it provides that "[t]he suspended sediment load and suspended sediment discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses." Id. The government challenges the district court's ruling that implementation of the Management Plan and construction of the Chimney Rock Section of the road would violate FWPCA because either activity would increase turbidity and suspended sediment levels above the 20 percent ceiling level established by the Plan.
 
 
 46
 The government first argues that the standards established in the Plan are no longer applicable to the Forest Service. It contends that these standards were superseded because California and the EPA accepted the Forest Service Best Management Practices (BMPs). The government claims that these BMPs are the applicable water quality standards for the Forest Service.
 
 
 47
 The BMPs, however, are merely a means to achieve the appropriate state Plan water quality standards. There is no indication in the Plan or in the agreements between the Forest Service and the Water Quality Control Board that the BMPs were to be considered standards in and of themselves. Adherence to the BMPs does not automatically ensure that the applicable state standards are being met. The district court found that the state standards would be violated if the Forest Service projects were implemented as described in the EISs. This finding is not clearly erroneous.[10]
 
 IV. Wilderness Evaluation
 
 48
 This appeal originally presented one issue in addition to those already discussed: whether the district court erred in holding that NEPA and the Wilderness Act required the Forest Service to evaluate the impact of the proposed actions on the wilderness potential of the Blue Creek Unit considered together with the Eightmile and Siskiyou Planning Units.
 
 
 49
 The parties are in agreement that this issue has been rendered moot by the enactment of the California Wilderness Act of 1984, P.L. 98-425. The Act places in wilderness about 19,000 acres of the Eightmile Creek Area and 26,000 acres of the Blue Creek Area.
 
 
 50
 Accordingly, we must vacate that portion of the district court's injunction that precludes timber harvesting or the construction of logging roads until the Forest Service prepares an EIS evaluating the wilderness potential of the Blue Creek Area together with the Eightmile and Siskiyou Roadless Areas.
 
 V. Conclusion
 
 51
 We vacate those portions of the district court's order that enjoin defendants from harvesting timber or constructing logging roads until they have (1) prepared an EIS evaluating the wilderness potential of the Blue Creek Area together with the Eightmile and Siskiyou Roadless Areas; and (2) completed studies demonstrating that the proposed logging activities would not reduce the supply of anadromous fish in those portions of the Klamath River that flow through the Hoopa Valley Indian Reservation.
 
 
 52
 In all other respects the decree of the district court is affirmed.[11]
 
 BEEZER, Circuit Judge, dissenting in part:
 
 53
 I concur in Parts II, III, and IV of Judge Canby's majority opinion. I also concur in Part V to the extent that it is based on the discussion in Parts II, III, and IV. Because I conclude that the plaintiffs have not established a first amendment violation, I cannot concur in Part I. To the extent that the majority upholds the permanent injunction against timber harvesting and road construction in the "high country," I respectfully dissent.
 
 
 54
 * Background
 
 
 55
 This action involves the proposed development of the Blue Creek Unit of Six Rivers National Forest. The Blue Creek Unit consists of 76,500 acres of mountainous land in the northwestern corner of California. The northeastern corner of the Blue Creek Unit, which is referred to as "the high country," is considered sacred by several Indian tribes. The district court described the Indian plaintiffs' use of the high country as follows:
 
 
 56
 Ceremonial use of the high country by the Yurok, Karok, and Tolowa tribes dates back to the early nineteenth century and probably much earlier. Members of these tribes currently make regular use of the high country for several religious purposes. Individuals hike into the high country and use "prayer seats" located at Doctor Rock, Chimney Rock, and Peak 8 to seek religious guidance or personal "power" through "engaging in emotional [and] spiritual exchange with the creator." Such exchange is made possible by the solitude, quietness, and pristine environment found in the high country. Certain key participants in tribal religious ceremonies such as the White Deerskin and Jump Dances must visit the high country prior to the ceremony to purify themselves and to make "preparatory medicine." The religious power these individuals acquire in the high country lends meaning to these tribal ceremonies, thereby enhancing the spiritual welfare of the entire tribal community. Medicine women in the tribes travel to the high country to pray, to obtain spiritual power, and to gather medicines. They then return to the tribe to administer to the sick the healing power gained in the high country through ceremonies such as the Brush and Kick Dances.
 
 
 57
 565 F.Supp. 586, 591-92 (N.D.Cal.1983) (citations omitted).
 
 
 58
 In the early 1970s, the Forest Service began studying various land use management plans for the Blue Creek Unit. In 1981, the Forest Service issued the Blue Creek Unit Implementation Plan ("the Management Plan"), which proposed to authorize harvesting of 733 million board feet of timber over an eighty year period.
 
 
 59
 Since the 1960s, the Forest Service has been upgrading a seventy-five mile road between Gasquet, California and Orleans, California ("the G-O road"). Approximately six miles of the G-O road lies within the Blue Creek Unit. In 1982, the Forest Service issued an environmental impact statement for the proposed construction of the final six miles, which is referred to as the "Chimney Rock Section."
 
 
 60
 The plaintiffs brought this action to enjoin the Forest Service from beginning those projects. On May 24, 1983, the district court entered a permanent injunction against the Forest Service. The relevant portions of the injunction are as follows:
 
 
 61
 IT IS HEREBY ORDERED that defendants are permanently enjoined from constructing the Chimney Rock Section of the G-O road and/or any alternative route for that Section which would traverse the high country ....
 
 
 62
 IT IS FURTHER HEREBY ORDERED that defendants are permanently enjoined from engaging in commercial timber harvesting and/or from constructing any logging roads in the high country ... pursuant to the 1981 Implementation Plan ... or any other land management plan.
 
 
 63
 565 F.Supp. at 606.
 
 II
 Applicable Law
 
 64
 The Indian plaintiffs are attempting to use the free exercise clause to bar the development of public lands. Such attempts have raised difficult problems for first amendment theory. See Stambor, Manifest Destiny and American Indian Religious Freedom: Sequoyah, Badoni, and the Drowned Gods, 10 Am.Ind.L.Rev. 59 (1982); Note, Indian Religious Freedom and Governmental Development of Public Lands, 94 Yale L.J. 1447 (1985) [hereinafter cited as Note, Indian Religious Freedom ]. These problems have been resolved through the adoption of a two-step analysis. First, the plaintiffs must show that the area at issue is central and indispensable to their religious practices and that the threatened activity would seriously interfere with or impair those practices. See Wilson v. Block, 708 F.2d 735, 742-44 (D.C.Cir.), cert. denied, 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983). Second, if the plaintiffs meet their burden, the government must show an overriding government interest that cannot be served through less restrictive alternatives. See id. at 740; Badoni v. Higginson, 638 F.2d 172, 176-77 (10th Cir.1980), cert. denied, 452 U.S. 954, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981).[1]
 
 
 65
 Four circuits have considered claims similar to those raised by the Indian plaintiffs in this case. In all four cases, the claims were rejected. In Sequoyah v. TVA, 620 F.2d 1159 (6th Cir.), cert. denied, 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 216 (1980), the Cherokee tribe sought to enjoin the construction of the Tellico Dam in Tennessee. The tribe asserted that the completion of the project would flood their "sacred homeland," destroying sacred sites, medicine gathering sites, holy places, and cemeteries and disturbing "the sacred balance of the land." Id. at 1160. The Sixth Circuit rejected the tribe's claims, holding that the tribe had failed to establish that their use of the lands was central to the practice of their religion. Id. at 1164-65. The court noted that it was "damage to tribal and family folklore and traditions, more than particular religious observances, which appears to be at stake." Id. at 1164.
 
 
 66
 The Tenth Circuit addressed a similar issue in Badoni v. Higginson, 638 F.2d 172 (10th Cir.1980), cert. denied, 452 U.S. 954, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981). In Badoni, the tribe challenged the construction of the Glen Canyon Dam in Utah and the management of Rainbow Bridge National Monument by the National Park Service. The dam created Lake Powell, which the tribe claimed had drowned some of their gods and cut off tribal access to a sacred prayer spot and spring. Id. at 176. The lake also provided convenient access to the Monument, thus increasing the number of tourists. Id. at 175. The tribe asserted "that tourists visiting the Monument desecrate the area by noisy conduct, littering and defacement of the Bridge and that the presence of tourists prevents [the tribe] from holding ceremonies near the Bridge." Id. at 177. The Tenth Circuit rejected the tribes' claims. Initially, the court held that the flooding of the sacred areas was justified by an overriding government interest. Id. Emphasizing establishment clause concerns, the court also refused to order the Park Service to police the actions of tourists visiting the Monument. The court stated:
 
 
 67
 We find no basis in the law for ordering the government to exclude the public from public areas during the exercise of First Amendment rights.
 
 
 68
 ... Although Congress has authorized the Park Service to regulate the conduct of tourists in order to promote and preserve the Monument, we do not believe plaintiffs have a constitutional right to have tourists visiting the Bridge act "in a respectful and appreciative manner." ... Were it otherwise, the Monument would become a government-managed religious shrine.
 
 
 69
 Id. at 179 (citation omitted).
 
 
 70
 The Eighth Circuit addressed a similar claim in Crow v. Gullet, 706 F.2d 856 (8th Cir.1983), aff'g 541 F.Supp. 785 (D.S.D.1982), cert. denied, 464 U.S. 977, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983). In Crow, two tribes challenged South Dakota's management of a state park containing Bear Butte, an important religious site for the tribes. The tribes argued that (1) the development of the park had increased the number of tourists in the park, reducing the Butte's spiritual value and impairing religious ceremonies; (2) the development of the park had restricted tribal access to the Butte; (3) their religious practices were impermissibly burdened by registration and permit requirements that restricted entry into the park; and (4) the state had failed to control the tourists, who disrupted the tribe's religious practices. Id. at 858. Citing Badoni and Sequoyah, the district court rejected each argument. 541 F.Supp. at 791-93. The Eighth Circuit adopted the district court's opinion. 706 F.2d at 858-59.
 
 
 71
 The District of Columbia Circuit considered this issue in Wilson v. Block, 708 F.2d 735 (D.C.Cir.), cert. denied, 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983). In Wilson, the Navajo and Hopi tribes sought to enjoin development of ski resorts in the San Francisco Peaks in Arizona. The tribes asserted that development of the Peaks "would be a profane act, and an affront to the deities, and that, in consequence, the Peaks would lose their healing power and otherwise cease to benefit the tribes." Id. at 740. The tribe also asserted that development would impair their ability to pray, to conduct ceremonies, and to gather sacred objects such as fir boughs. Id. The District of Columbia Circuit rejected the tribe's claims. The court noted that the development of the Peaks would not cause the tribes to be denied access to any sacred areas. Id. at 744. The court also concluded that development would not prevent the tribes from engaging in any religious practices. Id. at 744.
 
 
 72
 The district court was aware of the decisions in those circuits. Nevertheless, the district court found that the Forest Service had violated the first amendment. In doing so, the district court became the first federal court to enjoin the development of public lands on free exercise grounds.[2]
 
 III
 The Construction of the G-O Road
 
 73
 The district court found that the construction of the G-O Road violated the free exercise clause because it "would seriously damage the salient visual, aural, and environment qualities of the high country." 565 F.Supp. at 594-95. The district court did not make specific findings regarding the effects of the construction of the road. Instead, the district court relied exclusively on the conclusions of a study prepared by Dr. Dorothea Theodoratus at the request of the Forest Service. Cultural Resources of the Chimney Rock Section, Gasquet-Orleans Road, Six Rivers National Forest (1979) [hereinafter cited as Theodoratus Report ]. The study concluded that "intrusions on the sanctity of the Blue Creek high country are ... potentially destructive of the very core of Northwest [Indian] religious beliefs and practices." Id. at 420. Although the district court believed that the Theodoratus Report supported the issuance of an injunction, a careful review of the record reveals that the injunction was unsupported.
 
 A. The Theodoratus Report
 
 74
 The Theodoratus Report did not conclude that the mere existence of the G-O Road would impair the Indian plaintiffs' religious practices.[3] Instead, the report focused on five side effects. On careful examination, it is apparent that the side effects did not justify the issuance of an injunction against the construction of the road.
 
 
 75
 1. Road Building Activities Off the Right-of-Way
 
 
 76
 The Theodoratus Report concluded that the construction of the G-O Road threatened damage to archeological sites located off the right-of-way. Id. at 368-69. The report did not suggest that the destruction of any or all of those sites would impair the practice of the Indian plaintiffs' religion. See Sequoyah, 620 F.2d at 1164-65. Most of the sites appear to be exclusively of archeological, rather than religious, significance. See, e.g., Theodoratus Report at 358 (noting that "GO-24," one of the sites that could be affected, had not been used for rituals since before 1900). Moreover, the Theodoratus Report was prepared prior to the selection of the present proposed route. One of the reasons for the selection of that route was that there would be "no ground disturbing activities on any significant archaeological properties." Forest Service, Cultural Resources Preliminary Case Report Supplement 31 (1981) [hereinafter cited as Case Report ].
 
 
 77
 In any event, the Theodoratus Report assumes that the archeological sites would be damaged by negligent construction techniques or vandalism by construction workers. At most, such a threat of damage would justify an order requiring the Forest Service to safeguard against those dangers. The Theodoratus Report did not suggest that damage to the archeological sites could not be prevented by appropriate precautions.
 
 2. Logging
 
 78
 The Theodoratus Report correctly concluded that completion of the G-O Road would open up areas for commercial logging. Theodoratus Report at 369-70. To the extent that logging activities threatened the Indian plaintiffs' religious practices, however, the appropriate remedy was an injunction against logging. In fact, the district court entered such an injunction.[4] If the injunction against logging is upheld, the injunction against construction of the G-O Road is obviously not necessary to prevent logging. If the injunction against logging is overturned, on the other hand, surely an injunction aimed at stopping logging indirectly cannot be upheld on that ground. Accordingly, logging activities are irrelevant to the present analysis.
 
 3. Mining
 
 79
 The Theodoratus Report also concluded that the completion of the G-O Road would encourage mining activities in the high country. Id. at 370-71. The appropriate remedy, once again, was an injunction against mining. The injunction against the completion of the G-O Road cannot be upheld on this ground.
 
 4. Forest Service Activities
 
 80
 The Theodoratus Report concluded that the completion of the G-O Road would increase the volume of Forest Service activities in the high country. Id. at 371. The report also concluded, however, that "these activities are unlikely to have a serious effect on archaeological resources." Id.
 
 5. Recreational Activities
 
 81
 The Theodoratus Report concluded that completion of the G-O Road would increase the number of recreational visitors to the high country. Id. at 371-72. In essence, the report concludes that campers and hikers would invade the Indian plaintiffs' seclusion and violate the pristine nature of the area. In light of Badoni and Crow, this threat is not of constitutional magnitude. The Indian plaintiffs are not entitled to exclusive use of the high country.[5]
 
 6. Summary
 
 82
 The Theodoratus Report's conclusion that completion of the G-O Road threatened the Indian plaintiffs' free exercise rights was plausible. The district court erred, however, by assuming that the report's conclusion supported the issuance of an injunction. Three of the five potential adverse effects cited in the report--logging, mining, and recreational use--cannot support issuance of an injunction against road construction. The remaining two potential adverse effects--road construction activities off the right-of-way and Forest Service activities--do not pose a serious threat to the practice of the Indian plaintiffs' religion. Accordingly, the district court's reliance on the Theodoratus Report was misplaced.
 
 B. Other Effects
 
 83
 In addition to the potential effects discussed in the Theodoratus Report, the Indian plaintiffs claim that the completion of the G-O Road would cause two additional adverse effects. First, the Indian plaintiffs claim that visibility of the road from religious sites would impair their religious practices. The district court did not make findings regarding this claim. Nevertheless, it is apparent that the claim lacks merit. It is virtually inconceivable that the visibility of the G-O Road could seriously impair the practice of the Indian plaintiffs' religion. Moreover, the Forest Service proposed ten measures to mitigate the visual impact of the road:
 
 
 84
 1. The clearing limits from the top of the cuts to the bottom of fills will be kept to an absolute minimum.
 
 
 85
 2. The road would be constructed at the minimum practical width for two lanes; 24 feet travel-way on a 32 feet construction width.
 
 
 86
 3. Earthwork will be kept to a minimum by varying the grade and alignment of the road to fit the natural terrain.
 
 
 87
 4. Vegetation will be planted in cut and fills.
 
 
 88
 5. In areas of flat terrain (20% or less), clearing edges will be feathered to reduce contrasts and to give a natural appearance for vegetation alongside the road.
 
 
 89
 6. There will be no retaining walls.
 
 
 90
 7. Blue Creek will be crossed by in inconspicuous structural-plate metal arch bridge.
 
 
 91
 8. The asphalted road surface will have a black color which will blend in color with the surroundings.
 
 
 92
 9. Paving will eliminate dust-clouds associated with vehicle traffic.
 
 
 93
 10. Signing will be kept to the minimum needed for safety.
 
 
 94
 Case Report at 35.
 
 
 95
 Second, the Indian plaintiffs asserted that "increased aural disturbances from construction and use of the road would ... impair the success of religious and medicinal quests into the high country." 565 F.Supp. at 592. In Wilson, the District of Columbia Circuit rejected a similar argument. 708 F.2d at 744-45. Like the plaintiffs in Wilson, the Indian plaintiffs in this case have failed to prove that the completion of the road would prevent them from practicing their religion. While it is possible that noise from the road would impair religious and medicinal quests in the area adjoining the road, it is apparent that the high country is a large area. The Indian plaintiffs have not established that their quests can take place only in the area near the road.
 
 C. Conclusion
 
 96
 The district court found that the completion of the G-O Road would seriously impair the practice of the Indian plaintiffs' religion. The record does not support that finding. Accordingly, I would reverse the order granting a permanent injunction against completion of the G-O Road.
 
 IV
 The Management Plan
 A. The California Wilderness Act of 1984
 
 97
 On September 28, 1984, President Reagan signed the California Wilderness Act, Pub.L. No. 98-425, 98 Stat. 1619 (1984). The Act designated much of Six Rivers National Forest as wilderness areas. Id. Sec. 101(a)(19), (30), (34), (36), 98 Stat. 1621-24 (codified at 16 U.S.C. Sec. 1132 note). Of the land covered by the first amendment injunction, only small parcels are not included in the wilderness areas. One such parcel is a narrow strip of land set aside so that the completion of the G-O Road would not be precluded.
 
 
 98
 16 U.S.C. Sec. 1133(c) prohibits commercial activities in wilderness areas. The first amendment issues raised by the proposed development of the newly designated wilderness areas are therefore moot. I would vacate the order granting the injunction against development to the extent that it covers those areas. It is not clear whether the district court would have issued an injunction based upon the development of the remaining small parcels. Accordingly, I would remand to allow the district court to reevaluate its injunction in light of the Act.
 
 B. First Amendment Issues Upon Remand
 
 99
 Upon remand to reconsider its injunction against timber harvesting in the high country, I would ask the district court to reevaluate both the threat of limited development to the Indians' right to free exercise of religion, and the strength of the government's interest in developing the high country.
 
 
 100
 In light of the Wilderness Act, a serious question is raised as to whether timber harvesting on those few small parcels of land still available for development could pose any serious threat to the Indian plaintiffs' religious practices involving the larger territory. It may now be more feasible to accommodate the religious concerns of the Indians without foreclosing the limited logging activities that would still be possible in the wake of the wilderness designation.
 
 
 101
 Even if the district court were to conclude upon remand that any development would infringe the Indians' exercise of religion, I would instruct the court also to reexamine whether the government can demonstrate a compelling interest in developing those areas. I am not convinced that the district court has thus far given proper respect to the government's ownership rights in public lands.
 
 
 102
 In entering its order enjoining timber harvesting in the high country, the district court offered the following analysis regarding the government's interest:
 
 
 103
 Harvesting of timber from the Blue Creek Unit pursuant to the Management Plan would not serve any compelling public interest. That timber is a small fraction of the timber resources found in the entire Six Rivers National Forest. Its harvesting would not significantly affect timber supplies. Moreover, the regional timber industry will not suffer greatly without access to timber in the Unit.
 
 
 104
 565 F.Supp. at 596 (emphasis added).
 
 
 105
 The issue is not whether the public has a compelling interest, but whether the government has a compelling interest. The government's interest in putting public lands to productive use must be weighed carefully in the balance. While the government has many obligations that are not shared by private landowners, the government retains a substantial, perhaps even compelling, interest in using its land to achieve economic benefits.
 
 
 106
 Although it may be appropriate in some limited circumstances to order the preservation of discrete parcels of land to accommodate Indian religious exercises, the courts should guard against the creation of private religious preserves covering vast expanses of our public lands. To do otherwise is to risk violation by judicial order of the establishment clause.
 
 
 107
 These interests and concerns cannot properly be evaluated upon the present record before this court. We should await reconsideration by the district court of these matters in light of the changed circumstances created by the California Wilderness Act. Accordingly, the district court's injunction against timber harvesting cannot be upheld.
 
 V
 Conclusion
 
 108
 The district court's order was the first decision restricting the government's ability to develop public lands on the basis of the free exercise clause. I would follow the Sixth, Eighth, Tenth, and District of Columbia Circuits and overturn the order granting injunctive relief to the extent that it rests on the first amendment.
 
 
 
 [1]
 A "roadless area" is defined as "[a]n area of undeveloped Federal land within which there are not improved roads maintained for travel by means of motorized vehicles intended for highway use." FSM Sec. 8260(B)(3)(a)(1)
 
 
 [2]
 In view of our disposition of this appeal, we do not find it necessary to address the issues raised by plaintiffs-appellees
 
 
 [3]
 We review de novo the question whether the Indian plaintiffs have a valid first amendment claim. See Fraser v. Bethel School District, No. 403, 755 F.2d 1356, 1359 n. 2 (9th Cir.), cert. granted, --- U.S. ---, 106 S.Ct. 56, 88 L.Ed.2d 45 (1985); United States v. McConney, 728 F.2d 1195, 1202 (9th Cir.) (en banc), cert. denied, --- U.S. ---, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)
 
 
 [4]
 This finding distinguishes this case from Wilson v. Block, 708 F.2d 735 (D.C.Cir.), cert. denied, 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983), where tribal free exercise objections to development of the San Francisco Peaks in Arizona were rejected because the plaintiffs failed to show that the development would burden their religious beliefs or practices. Id. at 745
 
 
 [5]
 We find no merit in the government's claim that the district court set the boundaries of the high country area to encompass an area greater than that established by plaintiffs at trial. Our review of the record reveals that the evidence fully supports the designation of boundaries in the district court's injunction
 
 
 [6]
 The dissent suggests that the report of Dr. Theodoratus, relied upon by the district court, took an impermissibly broad view of religion. The Theodoratus Report, however, did deal with matters discretely categorized as "religious," although it complained of the artificiality of such compartmentalization in the Indian context. Cultural Resources of the Chimney Rock Section, Gasquet-Orleans Road, Six Rivers National Forest 44. The religious uses described by the Report unquestionably qualify as "religious" by the narrowest definition. In addition, the Theodoratus Report was not the only evidence of the religious uses of the high country; several witnesses testified to such use
 
 
 [7]
 "Roy may no more prevail on his religious objection to the Government's use of a Social Secuirty number for his daughter than he could on a sincere religious objection to the size or color of the Government's filing cabinets." Roy, --- U.S. at ---, 106 S.Ct. at 2152
 
 
 [8]
 See also 16 U.S.C. Sec. 228i(b) (lands in Grand Canyon National Park set aside for Havasupai Indians for purposes to include "religious purposes") Pub.L. 91-550, 84 Stat. 1437 (lands and Blue Lake in Carson National Forest set aside for Pueblo de Taos Indians for "traditional uses only, such as religious ceremonials")
 
 
 [9]
 The government's argument finds some support, albeit in a different context, in the opinion of the Chief Justice, speaking for a plurality of three, in Bowen v. Roy, --- U.S. at ---, 106 S.Ct. at 2156 ("Absent proof of an intent to discriminate against particular religious beliefs or against religion in general, the Government meets its burden when it demonstrates that a challenged requirement for governmental benefits, neutral and uniform in its application, is a reasonable means of promoting a legitimate public interest.") Justice O'Connor, also speaking for a plurality of three, disagreed with that part of the Chief Justice's opinion. --- U.S. at ---, 106 S.Ct. at 2166 ("Such a test has no basis in precedent and relegates a serious First Amendment value to the barest level of minimal scrutiny that the Equal Protection Clause already provides. I would apply our long line of precedents to hold that the Government must accommodate a legitimate free exercise claim unless pursuing an especially important interest by narrowly tailored means.")
 
 
 [10]
 The district court found that the adverse impact of either project on water quality and fish habitat in Blue Creek would significantly decrease the quantity of anadromous fish present in those portions of the Klamath River that flow through the Hoopa Valley Indian Reservation. 565 F.Supp. at 605. The court held that the government's countenance of this adverse impact would constitute a breach of its trust responsibility toward those Indians
 Because the Hoopa Valley Tribe was not a party to this action, we do not find this case to be an appropriate vehicle in which to determine the range and extent of the trust responsibility owed to the Tribe. We therefore vacate that part of the district court's injunction that requires defendants to complete studies demonstrating that the proposed logging activities would not reduce the supply of anadromous fish present in those portions of the Klamath River that flow through the Hoopa Valley Indian Reservation. In so doing, we note that the district court clearly viewed the deterioration of water quality in violation of FWPCA as the primary threat to the fish. The surviving portions of the district court's injunction preclude the defendants from logging until they complete and distribute studies demonstrating that such activities will not violate water quality standards of FWPCA.
 
 
 [11]
 Appellants' Motion to Supplement the Record on Appeal with material not presented to the district court either before or after the court rendered its opinion is DENIED
 
 
 [1]
 This case presents a mixed question of law and fact. The district court's findings of historical fact are reviewed under the clearly erroneous standard. United States v. McConney, 728 F.2d 1195, 1200-01 (9th Cir.) (en banc), cert. denied, --- U.S. ---, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984); see Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Fed.R.Civ.P. 52(a). The district court's selection of legal principles is reviewed de novo. McConney, 728 F.2d at 1200-01. In choosing a standard of review for the district court's application of law to facts, we refer "to the sound principles which underlie the settled rules of appellate review." Id. at 1202. If the inquiry is essentially factual, the clearly erroneous standard is applied. Id. If, on the other hand, we must "consider legal concepts in the mix of fact and law and ... exercise judgment about the values that animate legal principles," de novo review is applied. Id. In this case, de novo review is appropriate. See Fraser v. Bethel School District, 755 F.2d 1356, 1359 n. 2 (9th Cir.1985), rev'd on other grounds, --- U.S. ---, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986)
 
 
 [2]
 Because Indian religious concepts often differ substantially from Judeo-Christian concepts, some courts have been hesitant to recognize the first amendment rights of Indians in specific sites. See Note, Indian Religious Freedom, supra, at 1448-57. It is now well settled, however, that Indians have standing to raise first amendment objections to the development of public lands. E.g., Badoni, 638 F.2d at 176. The district court properly concluded that the Indian plaintiffs have a first amendment interest in the high country
 It does not follow, however, that all of the Indian plaintiffs' uses of the high country are entitled to first amendment protection. To qualify for first amendment protection, the plaintiffs' use of the high country must be "religious." See Clark, Guidelines for Free Exercise Clause, 83 Harv.L.Rev. 327 (1969). The Supreme Court has not adopted a clear definition of "religion." See Note, The Sacred and the Profane: A First Amendment Definition of Religion, 61 Texas L.Rev. 139, 141-52 (1982). It is apparent, however, that all forms of sociological activity are not entitled to protection under the free exercise clause. "A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation ... if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief." Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972).
 
 
 [3]
 It is apparent that Dr. Theodoratus applied an inappropriate definition of "religion." The report states:
 Because of the particular nature of the Indian perceptual experience, as opposed to the particular nature of the predominant non-Indian, Western perceptual experience, any division into "religious" or "sacred" is in reality an exercise which forces Indian concepts into non-Indian categories, and distorts the original conceptualization in the process.
 Theodoratus Report at 44. The report then suggests that hunting and fishing are religious activities for Indians. Id. While that may be correct in an anthropological sense, the federal Constitution does not recognize such a broad concept of "religion." See supra note 2.
 
 
 [4]
 The injunction against logging is discussed in Park IV, infra
 
 
 [5]
 In addition, the Forest Service proposed various measures to control visitor usage of the high country. These measures were as follows:
 
 
 [1]
 Traffic will be deterred from stopping by providing no turn-outs or parking areas
 
 
 [2]
 There will be no signing to draw attention to the ideological-spiritual or archeological sites
 
 
 [3]
 The selection of [the route] physically restricts traffic to the proposed travel-way as most of the route is situated on side slopes
 
 
 [4]
 The Forest Off-Road Vehicle (ORV) Plan prohibits off-road vehicle use in the area. Vehicles leaving the roadway would be in violation
 
 
 [5]
 Interpretive information provided to the public will not draw attention to the cultural values of the area
 Case Report at 35-36.